MOBIL OIL CORPORATION, Mobil Oil Refining Corporation, and Mobil Chemical Company, Inc., Appellants,

v.

Pearlie BAILEY, individually and as administratrix of the Estate of James E. Bailey, Deceased, James Thibodeaux, Kevin Bailey, Paul Bailey, and Carolyn Bailey, Appellees.

No. 09–04–225–CV.

Court of Appeals of Texas, Beaumont.

Submitted June 23, 2005.

Decided March 9, 2006.

Rehearing Overruled April 13, 2006.

Reagan W. Simpson, Christian A. Garza, King & Spalding, LLP, Houston, David P. Herrick, Herrick & Associates, PC, Gary D. Elliston, DeHay & Elliston, Dallas, Michael L. Baker, Strong, Pipkin, Bissell & Ledyard, LLP, Beaumont, for appellants.

Bryan O. Blevins, Aaryn K. Giblin, John A. Cowan, Provost Umphrey Law Firm, LLP, Beaumont, for appellees.

Before McKEITHEN, C.J., KREGER and GAULTNEY, JJ.

## OPINION

CHARLES KREGER, Justice.

Pearlie Bailey, individually and as administratrix of the Estate of James E. Bailey, deceased, James Thibodeaux, Kevin Bailey, Paul Bailey, and Carolyn Bailey ("Baileys") sued Mobil Oil Corporation, Mobil Oil Refining Corporation, and Mobil Chemical Company, Inc. ("Mobil") for the wrongful death of James Bailey from lung cancer. The Baileys' suit alleged James's death was caused by his exposure to asbestos on Mobil's premises. The jury found Mobil's negligence caused James's death and awarded $350,000 in actual damages (most of the actual damages were offset by settlement credits). Further, the jury found the harm to James resulted from malice and awarded $500,000 in exemplary damages. The trial court denied Mobil's post-trial motions and entered judgment on the verdict. From that judgment, Mobil brings this appeal. Because we find the Baileys presented no evidence of probative force of medical causation, we sustain issue two, reverse the trial court's judgment, and render judgment in favor of Mobil.

## BACKGROUND

It is not disputed that James worked at Mobil's Beaumont, Texas, facilities sporadically from the years 1966 to 1972. James's work assignments on Mobil's premises subjected him to asbestos exposure in varying degrees of severity. His work history also indicated he had been exposed to asbestos at other work sites, including ships, furnaces, and as an operator helper. The record also indicates that James was a long-time smoker, and that for the last forty to fifty years of his life, he smoked a full pack of cigarettes per day. Neither party disputes the fact that there was a total absence of medical evidence typifying asbestos exposure, such as the presence of asbestos bodies in James's lungs, scarring of his lung tissue, or pleural thickening.

As noted above, the Baileys' theory of the cause of James's lung cancer was severe asbestos exposure while working at Mobil's facilities. By contrast, Mobil's theory was that James's heavy smoking history alone caused his lung cancer because of the complete absence of asbestos-related indicators in his lungs. As such, medical causation was the key issue at trial and is

at the heart of Mobil's appeal. Mobil raises nine appellate issues, with issue one contending trial error "in admitting the testimony of Plaintiffs' experts on medical causation," and issue two raising the lack of "legally sufficient evidence to support the jury's finding that Mr. Bailey's lung cancer was proximately caused by Mobil's conduct in exposing him to asbestos at Mobil's facilities."

## STANDARD OF REVIEW

In *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 550 (Tex.1995), a products liability case, the Texas Supreme Court determined the proper standard for the admission of scientific expert testimony under Rule 702 of the Texas Rules of Civil Evidence.[1] Relying on language contained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the *Robinson* Court held that "in addition to showing that an expert witness is qualified, Rule 702[2] also requires the proponent to show that the expert's testimony is relevant to the issues in the case and is based upon a reliable foundation." *Robinson*, 923 S.W.2d at 556. The *Robinson* Court relied on *Daubert* for support, *viz:*

> Rule 702 requires the proffered testimony to be: (1) "scientific knowledge" (2) which will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 589, 113 S.Ct. at 2795 (quoting FED. R. EVID. 702). To constitute "scientific knowledge," the proffered testimony must be reliable. *Id.* In addition, to be helpful to the trier

of fact, the evidence must be relevant. Scientific evidence is relevant when there is a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592, 113 S.Ct. at 2796.

*Robinson*, 923 S.W.2d at 555.

There is no question that *Robinson's* relevant/reliable requirements were preconditions for *admissibility* only. Indeed, the Court noted that "legal sufficiency of scientific evidence" was an inquiry "outside the scope of Rule 702." *Id.* at 554. At present, Robinson continues to be the seminal case with regard to *admissibility* of any type of expert testimony, including scientific testimony, in Texas.

In 1997, the Texas Supreme Court handed down *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706 (Tex.1997). The Court framed the issues in *Havner*, another products liability case, in the following manner:

> Merrell Dow challenges the legal sufficiency of the Havners' causation evidence and the admissibility of some of that evidence and further contends that its due process rights under the United States Constitution and its due course rights under the Texas Constitution were denied. Because of our disposition of this case, we reach only the no evidence point of error.

*Id.* at 709. Although it limited review to the legal sufficiency inquiry only, the *Havner* Court proceeded to incorporate the *admissibility* standards announced in *Rob-*

---

1. In March of 1998, the Texas Rules of Evidence, which govern both civil and criminal proceedings, replaced the former Texas Rules of Civil Evidence and Texas Rules of Criminal Evidence. As the current version of Rule 702 is identical to the pre-amendment version, all further references to Rule 702 will be to the current version.

2. **Rule 702. Testimony by Experts**
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

*inson* into the standard for reviewing no evidence appellate issues. *See id.* at 711, 712, 714 ("The issue in Robinson was admissibility of evidence, but as we have explained the same factors may be applied in a no evidence review of scientific evidence.").[3]

The *Havner* Court's development of its no evidence analysis in toxic tort cases takes a stricter approach than that applied in a traditional no evidence review, as is evidenced by the following:

> It could be argued that looking beyond the testimony to determine the reliability of scientific evidence is incompatible with our no evidence standard of review. If a reviewing court is to consider the evidence in the light most favorable to the verdict, the argument runs, a court should not look beyond the expert's testimony to determine if it is reliable. But such an argument is too simplistic. It reduces the no evidence standard of review to a meaningless exercise of looking to see only what words appear in the transcript of the testimony, not whether there is in fact some evidence. We have rejected such an approach. *See Schaefer [v. Texas Employers' Ins. Ass'n]*, 612 S.W.2d [199,] 205 [(Tex.1980)]; *see also Burroughs Wellcome [Co. v. Crye]*, 907 S.W.2d [497,] 499–500 [(Tex.1995)].
>
> . . . .
>
> Although we recognize that there is not a precise fit between science and legal burdens of proof, we are persuaded that properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort case and that there is a rational basis for relating the requirement that

there be more than a "doubling of the risk" to our no evidence standard of review and to the more likely than not burden of proof.

*Havner,* 953 S.W.2d at 712, 717 (some citations omitted).

At any rate, the *Havner* Court's no evidence standard applied to toxic-tort litigants attempting to demonstrate that exposure to a given substance increased the risk of the particular injury alleged when direct, scientifically reliable proof of causation was missing. *Id.* at 715. Such litigants are reduced to relying entirely on circumstantial evidence in the form of scientific studies for proof of causation. *Id.* In their attempt to link the limb reduction birth defect with the drug Bendectin, the *Havner* plaintiffs relied on epidemiological studies examining existing populations. *Id.* at 724–25. To raise a fact issue on causation, the Havner's epidemiological studies were required to establish a "more than doubling of the risk" that this birth defect, when compared to the same birth defect in an unexposed or "control" population, was attributable to the mother's Bendectin ingestion during pregnancy. *Id.* at 715–17, 724–26. In addition to requiring that the scientific evidence establish "more than a doubling of the risk," the *Havner* Court's no evidence standard also encompassed the following:

> To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that the injured person was exposed to the same

**3.** *See Cano v. Everest Minerals Corp.,* 362 F.Supp.2d 814, 821 (W.D.Tex.2005) ("However, *Havner* was not concerned with the *admissibility* of expert testimony, but the *legal suffi-* *ciency* of that evidence, although the inquiries are conflated under Texas law in the context of expert testimony.") (emphasis in original).

substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study. ... Further, if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *See generally E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 559 (Tex.1995) (finding that the failure of the expert to rule out other causes of the damage rendered his opinion little more than speculation); *Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969) (holding that a cause becomes "probable" only when "in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result.")

*Havner,* 953 S.W.2d at 720.

The Supreme Court once again revisited the "no evidence" standard of appellate review in the recent case of *City of Keller v. Wilson,* 168 S.W.3d 802 (Tex.2005). In *City of Keller,* the Court answered the question—"Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence" or by considering only evidence favorable to the verdict and disregarding any evidence to the contrary. The Court concluded the two standards are, in effect, the same: "properly applied[,]" they "arrive at the same result[.]" *Id.* at 827. As the Court explained, "Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. "Contrary evidence" may not be disregarded "if there is no favorable evidence" or if contrary evidence "renders supporting evidence incompetent" or "conclusively establishes the opposite." *Id.* at 814–18. A jury's credibility determinations must be examined for reasonableness; this means that jurors may not ignore undisputed testimony that is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 820 (footnote omitted).

When reviewing a "no evidence" challenge to expert testimony, " '[the] expert's bare opinion' " does not constitute "some evidence," and " '[t]he substance of the testimony must be considered.' " *See Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004) (quoting *Havner,* 953 S.W.2d at 711). Additionally, the " 'underlying data should be independently evaluated in determining if the opinion itself is reliable.' " *Id.* (quoting *Havner,* 953 S.W.2d at 713). "The proponent of the evidence bears the burden of demonstrating that the expert's opinion is reliable." *Id.* (citing *Robinson,* 923 S.W.2d at 557). "If the expert's testimony is not reliable, it is not evidence." *Id.* (citing *Havner,* 953 S.W.2d at 713). The Court in *Helton* then provided a condensed rationale for holding unreliable expert testimony to be "no evidence":

The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex.2002). Under this requirement, expert testimony is unreliable if it is not grounded " 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.' " *Id.* (quoting *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 590 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993)). Expert testimony is also unreliable if the court concludes that " 'there is simply too great an analytical gap between the data and the opinion proffered.' " *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). In reviewing the reliability of expert testimony, the court is not to determine whether the expert's conclusions are correct; rather, the court should determine only whether the analysis used to reach those conclusions is reliable. *Zwahr*, 88 S.W.3d at 629 (citing *Gammill*, 972 S.W.2d at 728). *Helton*, 133 S.W.3d at 254.

Toxic tort cases usually require proof of both "general" and "specific" causation with regard to the effects of the toxic substance. *Frias v. Atlantic Richfield Co.*, 104 S.W.3d 925, 928 (Tex.App.-Houston [14th Dist.] 2003, pet. denied)(citing *Havner*, 953 S.W.2d at 714). "General causation exists when a substance is capable of causing a particular injury or condition in the general population, while specific causation exists when a substance causes a particular individual's injury." *Daniels v. Lyondell–Citgo Refining Co.*, 99 S.W.3d 722, 725–26 (Tex.App.-Houston [1st Dist.] 2003, no pet.)(citing *Havner*, 953 S.W.2d at 714). Proving one type of causation does not necessarily prove the other, and both are needed in situations where direct, reliable medical testing for specific causation has not taken place. *See generally Havner*, 953 S.W.2d at 714–15.

## APPLICATION OF LAW TO FACTS

We must first address the Baileys' contention that Mobil has waived its issue complaining of the trial court's failure to exclude plaintiffs' causation experts for failure to meet the *Havner/Robinson* reliability standards. The record indicates that prior to the beginning of testimony, Mobil filed written objections to the Baileys' causation testimony grounded in the standards discussed in *Havner, Robinson,* and *Daubert.* In *Coastal Transport Company, Inc. v. Crown Central Petroleum Corporation,* 136 S.W.3d 227, 232–33 (Tex. 2004), the Supreme Court clarified its holding in *Maritime Overseas Corporation v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998), where the court stated that "[t]o preserve a complaint that scientific evidence is unreliable and, thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Coastal Transport Co.,* 136 S.W.3d at 232–33 (quoting *Maritime Overseas Corp.,* 971 S.W.2d at 409). Mobil's written *Havner/Robinson* objections filed prior to the start of testimony clearly were timely and preserved the issue for appellate review.

At the time of trial, Bailey was one of three plaintiffs alleged to have contracted asbestos-related illnesses from asbestos exposure. The other two plaintiffs, Ruth Ladner and Joyce Myers, are not parties to the instant appeal. The record indicates that although Bailey, Ladner, and Myers claimed asbestos exposure was the cause of their medical infirmity, the circumstances of exposure were unique to each individual as were their personal habits and the resulting physical manifestations. One plaintiff, Ladner, was diagnosed with asbestosis. She had a minimal smoking history and her exposure purportedly came from washing her husband's asbestos-exposed work clothes "several times a week" for about twenty-seven years. Ladner's husband worked in the petro-chemical industry for a number of years. The second plaintiff, Myers, alleged that she contracted mesothelioma from washing the asbestos-exposed work clothes of her father, an insulator at Mobil, on a more intermittent basis during the

times she lived with him which totaled approximately sixteen years. Myers also had a minimal smoking history. However the Baileys' expert, Dr. Gary Friedman, testified that there is no relationship at all between smoking and mesothelioma because the disease does not start in the lungs, but outside the lungs.

Because of Ladner's and Myers' illnesses, the jury was provided with a great deal of testimony and related medical and scientific evidence relating to asbestos exposure and its role in the diseases asbestosis and mesothelioma. This would explain, in part, why much time and effort were spent by plaintiffs offering proof of general causation—that asbestos is a known carcinogen, and exposure to asbestos raises the risk that the exposed person could eventually develop a variety of asbestos-related diseases, such as asbestosis, mesothelioma, and lung cancer.

As the proponent of expert testimony, the Baileys had the burden to raise a fact issue as to specific causation, i.e., to offer competent evidence that asbestos exposure, more likely than not, caused James's lung cancer, and also to negate with reasonable certainty James's heavy smoking history as the other plausible cause of his lung cancer. *See Havner*, 953 S.W.2d at 720. The Baileys' medical causation experts were Dr. Gary Friedman and Dr. Richard Lemen. On appeal, the Baileys contend these witnesses provided scientifically reliable evidence to prove James's exposure to asbestos at Mobil's facilities more likely than not was the cause of his lung cancer. It is true that the record includes Dr. Friedman's testimony that James's "combined exposures" to asbestos at Mobil's facilities doubled his risk for

lung cancer. It is also true that Dr. Lemen testified to a "synergistic effect" when a smoker is exposed to asbestos in that the smoker's risk for eventually developing lung cancer "jumps well over 50 percent." In support of their causation experts' testimony, the Baileys direct our attention to certain "scientific literature" upon which Drs. Friedman and Lemen relied for their respective opinions. Some of this scientific literature we have been able to locate as exhibits in the record and some we have not.

In none of the exhibits to which the Baileys have directed us is the employed methodology entirely clear, given that the authors of the studies admit to knowledge of studies reaching the opposite results. For example, in Plaintiffs' Exhibit 16, "Asbestos and the Histogenesis of Lung Carcinoma"[4] the authors note that "experimental data confirm the synergism between cigarette smoke and asbestos[.]" However, the authors provide this *caveat* early in the article:

## WHO HAS STUDIED THE RELATIONSHIP BETWEEN ASBESTOS AND BRONCHOGENIC CARCINOMA?

Epidemiologists, occupational physicians, radiologists, pathologists, and biologists have addressed the problem. Each discipline looks at the problem from a different perspective, has its own methodology and its own literature, and answers the questions in different terms. General conclusions are best made only when the limitations of each discipline are appreciated and when the results of the different disciplines are synthesized.[5]

---

4. Eugene J. Mark, M.D. & Dong–Hwan Shin, M.D., *Asbestos and the Histogenesis of Lung Carcinoma*, 9 Seminars in Diagnostic Pathology, No. 2, 110–116 (May 1992).

5. *Id.* at 110.

The authors continue by suggesting the theory that asbestos causes lung cancer in the absence of asbestosis is not settled.

## MUST PULMONARY FIBROSIS OR ASBESTOSIS BE PRESENT IN THE LUNG TO ATTRIBUTE THE CARCINOMA TO ASBESTOS?

Although the requirement of coexistent carcinoma and asbestosis to make etiologic attribution is convenient, basic biologic principles *suggest* that this approach is oversimplified and not correct. Inability to integrate experimental results with pathological and then epidemiological studies contributed to delay in accepting the fact that asbestos could cause carcinoma and *now hinders* appreciation that asbestos can cause carcinoma in the absence of asbestosis. (footnotes omitted)(emphasis added).[6]

The concluding paragraph to this article raises significant concerns as to both the relevance and the reliability for use by either of the Baileys' causation experts, *viz:*

## TO WHAT DEGREE CAN WE BE CERTAIN THAT ASBESTOS CAUSED OR CONTRIBUTED TO A BRONCHOGENIC CARCINOMA?

Based on the issues raised here, there are eight possible conclusions (or variations thereof) on the relationship between asbestos and a bronchogenic carcinoma after examining lung tissue of an individual. These possibilities are listed in Table 4. Some are mutually exclusive. These conclusions do not take into account the exposure history of the patient.[7]

Indeed, conclusion 6 listed in Table 4 of the article, as to the degree of certainty that asbestos caused or contributed to an individual's lung cancer after examining lung tissue states, "Certain that asbestos did not cause the carcinoma because no asbestos is found[,]" while conclusion 5 states, "Possible, but cannot say because no asbestos is found."[8] Neither of the Baileys' causation experts explained the bases underlying their reliance on the information in Plaintiffs' Exhibit 16, nor what part or parts of Plaintiffs' Exhibit 16 had general acceptance in the current scientific community. As the Court in *Havner* has instructed:

If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable. Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. A flaw in the expert's reasoning from the data may render reliance on a study unreasonable and render the inferences drawn therefrom dubious. Under that circumstance, the expert's scientific testimony is unreliable and, legally, no evidence.

*Havner,* 953 S.W.2d at 714.

Plaintiffs' Exhibit 17, titled "Asbestos Inhalation, Not Asbestosis, Causes Lung Cancer," is a commentary written by Dr. Jerrold L. Abraham, M.D.[9] His thesis appears to be that, from a medical perspective, it is entirely immaterial whether an individual must be diagnosed with asbesto-

---

6. *Id.* at 113.

7. *Id.* at 114.

8. *Id.*

9. Jerrold L. Abraham, M.D., Commentary, *Asbestos Inhalation, Not Asbestosis, Causes Lung Cancer,* 26 Am. J. Indus. Med. 839–42 (1994).

sis before a subsequent diagnosis of lung cancer can be attributed to asbestos exposure or not. Because asbestosis is itself a disease, not an agent of disease, Abraham argues that it would be more "logical" to say that "asbestos inhalation causes both asbestosis and lung cancer and that the majority of persons who have either of these two diseases related to asbestos exposure have had sufficient exposure to result in lung fibrosis." [10] The fact that something may be thought to be more "logical" is not sufficient to establish causation. Further observations by Abraham echo ones made by the Court in *Havner*, and place the controversy in proper context: [11]

> The final issue that needs more open dialogue is the *medico-legal implications* of all this discussion of "causation" related to asbestos. There is the potential for at least the appearance of many conflicts of interest in this area. Nearly all who write scientific articles in this field sooner or later get called upon to serve as expert witnesses for either plaintiffs or defendants, or both. All who write or edit in this field must be extremely careful to not give the impression that the article in a medical journal is serving the interests of litigation before the interests of science. Owing to different legal rules for proof ("more likely than not") versus scientific ones ("greater than 95% probability" or "beyond a reasonable shadow of a doubt"), articles such as Dr. Churg's editorial, while useful in stimulating scientific discussion and further research, might be kept in perspective if they included a brief discussion of the article's medico-legal ramifications.
>
> . . . .

There is no question that Churg [1993a] is correct in stating: "Probably the most contentious question in regard to asbestos is the relationship between asbestos exposure and the development of carcinoma of the lung" (p. 64). Perhaps open discussion of all the factors involved in this controversy can expedite its resolution.

Dr. Abraham's commentary does not purport to be an epidemiological article containing explanations of detailed epidemiological studies; instead, it is a reply to a "recent editorial on asbestos and lung cancer by Dr. Andrew Churg [1993b]." [12] Indeed, it would seem that Dr. Abraham's commentary raises more questions regarding the scientific methodology in this area than it answers, as noted in the following: [13]

> A second major problem with attempts to link asbestosis and lung cancer is that different studies have radically different thresholds for defining/recognizing asbestosis. Is it to be required that someone has radiologic asbestosis > 1/0 ILO category to have lung cancer attributed to asbestos, or do they need biopsy proven asbestosis? Grade 1 of the NIOSH/CAP criteria [Craighead et al., 1982] is not even termed asbestosis by Churg now [1993a], (but rather asbestos-airway disease), so even the pathologic criteria would have to be clearly defined. . . .

While highly informative, we find that Dr. Abraham's commentary is simply not an epidemiological study with factors such as those described in *Robinson*, and, therefore, without sufficient indicia of reli-

**10.** *Id.* at 841.

**11.** *Id.* (emphasis in original).

**12.** *Id.* at 839.

**13.** *Id.*

ability so as to provide objective, independent validation of the causation experts' methodology in reaching their opinion on the cause of James's lung cancer. See Robinson, 923 S.W.2d at 557. These *Robinson* "admissibility" factors may also be applied in a no evidence review of scientific evidence. *See Havner*, 953 S.W.2d at 714.

Plaintiffs' Exhibit 18 consists of a study published in the April 29, 1995, issue of the British medical journal, *The Lancet*, and was "designed to test the hypothesis that the risk of lung cancer from asbestos exposure is confined to persons with radiographic evidence of pulmonary fibrosis."[14] From all appearances, it would seem this study was conducted under recognized scientific methodology with the various results subjected to statistical significance. The results of the study "suggest that asbestos is associated with lung cancer even in the absence of radiologically apparent pulmonary fibrosis."[15] However, one questionable factor noted in the study and not explained or resolved by either of the Baileys' causation experts is the authors' mention of two other epidemiological studies, one involving male "asbestos-cement workers in Louisiana, USA, and the other asbestos miners in South Africa."[16] The Louisiana study "found no excess of lung cancer in workers without small opacities on the chest radiograph, even among long-term workers," and it was particularly noted that in workers followed for at least 20 years from first exposure and having no "small opacities" on chest x-rays, "only 10 developed respiratory cancers, whereas 9.5 were expected."[17] The South African study found proportional mortality ratio for lung cancer was raised in those miners

with histological evidence of pulmonary fibrosis, but not otherwise.

While we find little to doubt as to the reliability of the scientific methodology represented in Plaintiffs' Exhibit 18, of the three exhibits, Plaintiffs' Exhibits 16, 17, and 18, it is the only one representative of the type of epidemiological study sufficiently reliable under the *Havner/Robinson* standards. However, the *Havner* Court noted that it was not holding a single reliable epidemiological test is legally sufficient evidence of causation. *Havner*, 953 S.W.2d at 718. "Careful exploration and explication of what is reliable scientific methodology in a given context is necessary." *Id.* at 719. In the instant case, the testimony from the Baileys' causation experts does not include any "careful exploration and explication" of what is reliable scientific methodology in the context of epidemiological studies linking asbestos exposure to a subsequent lung cancer diagnosis in a heavy smoker who is otherwise asymptomatic with regard to additional "typical" asbestos-related maladies.

More to the point, however, is the fact that neither of plaintiffs' two causation experts made a sufficient showing that the relevant scientific community had generally accepted the theory of "synergism," or even if accepted, that the scientific community had generally accepted the theory that there were no physical prerequisites to this "heavy smoking/asbestos exposure" synergism. Furthermore, what are we to make of the fact that each of the Baileys' causation experts made James's heavy smoking history at least equally responsible for his lung cancer as his asbestos

**14.** Paul Wilkinson et al., *Is Lung Cancer Associated With Asbestos Exposure When There Are No Small Opacities on the Chest Radiograph?*, 345 The Lancet 1074–78 (April 29, 1995).

**15.** *Id.* at 1074.

**16.** *Id.* at 1077.

**17.** *Id.*

exposure? Recall that *Havner* admonishes reviewing courts that, if other plausible causes exist that could be negated, plaintiffs must offer evidence excluding those other plausible causes of the injury or condition "with reasonably certainty." *Havner*, 953 S.W.2d at 720.[18] We are only left to conclude that there is no scientifically reliable evidence to support the verdict for the Baileys in this case. Mobil's second issue is sustained. We reverse the judgment of the trial court and render judgment for Mobil.

REVERSED AND RENDERED.

DAVID GAULTNEY, Justice, dissenting.

I respectfully dissent. I would hold a specific objection was required to the reliability of a learned treatise when the learned treatise was offered as evidence. More than a scintilla of evidence supports the jury verdict. However, because of charge error, I would hold the judgment must be reversed and the cause remanded for a new trial.

Appellant challenges the legal sufficiency of the "evidence to support the jury's finding that Mr. Bailey's lung cancer was proximately caused by Mobil's conduct in exposing him to asbestos at Mobil's facilities." In addressing this legal sufficiency challenge to the causation finding, the majority correctly looks to *Havner* to assess the reliability of the expert testimony supporting the jury's finding. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712–13 (Tex.1997). However, *Havner* dealt with a drug which could not be demonstrated to cause the type of injury the plaintiff suffered. *Id.* at 711, 724–30. From my reading of the briefs, it seems

unchallenged in this appeal that asbestos is a carcinogen capable of causing lung cancer under some circumstances. The dispute in this appeal is over the circumstances in which that causation occurs. This difference is highlighted by appellant's citation to a United States Supreme Court decision in which the Court stated "[t]here is an undisputed relationship between exposure to asbestos sufficient to cause asbestosis and asbestos related-cancer." *See Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 154–55, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003). The dispute here is whether asbestos exposure sometimes causes lung cancer without causing asbestosis.

In *Havner*, the Supreme Court observed that the "opinions to which the Havners' witnesses testified have never been offered outside the confines of a courthouse." *Havner*, 953 S.W.2d at 726. That seems a distinction from the evidence at issue here. Dr. Lemen, plaintiffs' epidemiologist, acknowledges a controversy exists in the scientific community concerning whether a diagnosis of asbestosis is a prerequisite to attributing a lung cancer to asbestos exposure. He explained the controversy, and explained some non-judicial uses of the information nevertheless. The following testimony from Dr. Lemen is illustrative:

Q. [Plaintiffs' Counsel] Doctor, one of the issues that's been raised in this case is the absence of asbestosis in Mr. Bailey's case. Are you familiar with—familiar with the debate regarding the necessity of asbestosis in order to diagnose asbestos related lung cancer?

A. I am.

---

**18.** Assuming only for the sake of argument that a "synergistic effect" between James's asbestos exposure and his heavy smoking was proven, this would not "negate" the undisputed role heavy smoking played in his development of lung cancer but would apparently accelerate the role his asbestos exposure played, if any, in his lung cancer.

Q. Are you familiar within this body of medical literature of any studies which support the diagnosis of asbestos related lung cancer in the absence of asbestosis?

A. Yes. I think you have to put it in context, if I may. And I think to put it in context, in the very beginning of our knowledge about lung cancer we only saw it in people who had the disease asbestosis, leading many of the early researchers to believe that you had to have asbestosis or some form of scarring or some lung disease related to asbestos before you could develop a cancer.

As the exposure concentrations went down and the amount of asbestosis went down, we started seeing lung cancer in people in the absence of this scarring and this asbestosis.

While there is still a controversy about this issue—some believe that you can't get lung cancer without asbestosis—there is a prevailing group of people that believe that there are cancers of the lung occurring in people that do not have any signs or symptoms of asbestosis or related conditions of the lung. And this has been borne out in cross-sectional medical studies in looking at people that are in the asbestos industry that have developed lung cancer.

So, again, this is a controversial issue; but it is one that, in my opinion—and I'm speaking for myself—there's enough evidence to show that in the absence of asbestosis lung cancer can also develop.

Q. Okay. Are you familiar with the Dr. Mark and others' article entitled "Asbestos and the Histogenesis of Lung Carcinoma"?

A. Yes.

Q. And does Dr. Mark conclude that you do not need asbestosis in order to facilitate the diagnosis of asbestos related lung cancer?

A. Yes, he does. And I think most of the medical textbooks that are written today, including papers that I've written myself—

(Defendant's Counsel): Excuse me, your Honor. Nonresponsive past "yes".

Q. (Plaintiff's Counsel): Dr. Lemen, in addition to Dr. Mark, you also referenced that there was other supporting material for that position. And can you detail that for us?

A. Yes. I think that the most recent medical texts in occupational lung disease as well as occupational medicine—including one by Rosenstock and Cullen in 1996, which is probably one of the standard bearers that we use in medical schools today—would indicate that you don't have to have asbestosis for the development of lung cancer. I've written on this myself, and it's my opinion that you don't have to have asbestosis or any lung markers to attribute a lung cancer to exposure to asbestos.

As a matter of fact, in 1996 there was a panel convened in Helsinki of experts from around the world that met to look at criteria for the development of asbestosis, lung cancer, mesothelioma, and the asbestos related diseases. And it was their conclusion that you have lung cancer without having preexisting other types of asbestotic type disease of the lung.

Q. And, Doctor, I'd just like to show you briefly Exhibit 17.

And in the title does this fairly sum up your opinion, "Asbestos Inhalation, Not Asbestosis, Causes Lung Cancer"?

A. Absolutely.

Q. Now, you mentioned smoking, Doctor. What is your opinion with respect to smoking and the development of lung cancer?

A. We know that the leading cause of lung cancer within the United States and the world today is cigarette smoking. And you can't discount cigarette smoking for its role in the development of lung cancer. We generally believe that about 15 percent—that a person that's not exposed to asbestos might have about a 15 percent chance of developing lung cancer. We know, however, that if you're exposed to asbestos, 10 to 15 percent, depending on which literature you look at. But if you're exposed to asbestos, that risk jumps well over 50 percent. So, we know it's not just a additive effect. In other words, 10 percent and then you smoke and it adds another 5 percent or 10 percent, whatever you want to say. It's a synergistic effect. In other words, it's a multiplicative effect. It multiplies.

So, asbestos workers that smoke cigarettes have a phenomenal risk of developing lung cancer. And this has been well-documented in the cancer literature, and I think that you will find this representation to be true in the textbooks that deal with occupational disease today.

As the Supreme Court noted in *Havner*, a factor a court should consider in assessing the scientific reliability of an expert's opinion is "the non-judicial uses that have been made of the theory or technique." *Id.* at 714 (citing *E.I. duPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). If the scientific evidence is relied on for non-judicial purposes, as in medical textbooks used to prevent or diagnose disease, that factor should weigh in favor of a court's finding the information reliable. Testimony that the "most recent medical texts in occupational lung disease as well as occupational medicine" "would indicate that you don't have to have asbestosis for the development of lung cancer" suggests an important non-judicial use of the information and acceptance of the theory in the medical community.

Dr. Friedman, a medical doctor specializing in pulmonary and occupational medicine, testified Bailey's cancer was caused by smoking and exposure to asbestos, and the two exposures acted synergistically. When asked whether asbestosis must be diagnosed to attribute the lung cancer to asbestos exposure, Dr. Friedman testified as follows:

No. I believe the current thinking is you don't have to have the disease asbestosis. Those are separate diseases. Asbestosis and lung cancer, pleural plaque, mesothelioma, each are individual diseases. I do share the opinion that you have to have a high level of exposure, a level that sometimes can cause asbestosis, so you see the two together . . . . But, if necessary, we can look at a lot of articles and show you can get lung cancer without having asbestosis. It's the asbestos fiber that causes the disease at a high concentration but not—you don't have to have asbestosis, which is a whole different disease.

This testimony occurred while Dr. Friedman was making a slide presentation to the jury, and he then showed a slide of one article he described as a "consensus report" of "19 world authorities" who concluded asbestosis was not a prerequisite to asbestos-caused lung cancer. He apparently also showed a slide of an article entitled "Radiographic Asbestosis Is Not a Prerequisite For Asbestos Associated

With Lung Cancer." Throughout the slide presentation Dr. Friedman cited scientific writings. The slides are not in the record, nor are many of the articles on which he and appellees rely.[1]

Appellees cite this Court to three record exhibits admitted without objection as learned treatises. The parties agreed the exhibits, as learned treatises, would not "go back to the jury room." *See* Tex.R. Evid. 803(18). Appellant's response to the offer of these exhibits at trial was as follows:

> [Defendant's Counsel]: No objections.
>
> [Defendant's Counsel]: Judge, we have no objection except we would note that they are learned treatises. So they don't go back to the jury room, although they're admitted for every other purpose.
>
> [Plaintiffs' counsel]: Agreed.
>
> The Court: Admitted.

Generally, if a party does not object at the time objectionable evidence is offered, error is not preserved for appeal. *See Clark v. Trailways, Inc.*, 774 S.W.2d 644, 647 (Tex.1989); Tex.R.App. P. 33.1(a). Objections should be timely and specific. Tex.R. Evid. 103(a)(1); Tex.R.App. P. 33.1(a). "A specific objection is one which enables the trial court to understand the precise grounds so as to make an informed ruling, affording the offering party an opportunity to remedy the defect, if possible." *McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 74 (Tex.1989).

A "learned treatise" under the Rules of Evidence is a document "established as a reliable authority" by a witness or judicial notice. *See* Tex.R. Evid. 803(18). One appellate court in a criminal case explained the rationale for the learned treatise exception to the hearsay rule as follows:

> The rationale for the learned treatise exception lies in the fact that a "high standard of accuracy is engendered by various factors: the treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake." Fed.R.Evid. 803 advisory committee's note. The author of a treatise is likely to have been motivated in writing the treatise by a strong desire to accurately state the full truth. Edward W. Cleary, McCormick's Handbook of the Law of Evidence 743 (1972). Unlike an expert witness, the author of a learned treatise is impartial, disinterested and not awaiting a fee for testifying. Jack B. Weinstein & Margaret A. Berger, 4 Weinstein's Evidence ¶ 803–25 (1990).

*Loven v. State*, 831 S.W.2d 387, 396 (Tex. App.-Amarillo 1992, no pet.)(footnote omitted). That court held evidence meeting the learned treatise exception "is, of necessity, reliable." *Id.*

When a learned treatise is offered as evidence, a party should object to its admission in evidence if the article is considered unreliable. *See generally* David H. Kaye, David E. Bernstein, & Jennifer L Mnookin, The New Wigmore: A Treatise on Evidence § 4.4.2(a), at 140–41(2004)("The author of an admitted learned treatise is essentially serving as an expert via hearsay, and therefore should be subject to similar strictures as testifying experts.")(footnote omitted). A specif-

---

1. The absence from the record of many learned treatises cited by both of appellees' experts makes difficult appellate review for reliability and legal sufficiency. *See Exxon Corp. v. Makofski*, 116 S.W.3d 176, 183 (Tex. App.-Houston [14th Dist.] 2003, pet. denied). ("But while the rules of evidence withhold learned treatises from jurors, that does not mean they should be withheld entirely from the record. Without them, we are hard-pressed to conduct the kind of review *Havner* requires.").

ic and timely objection to a learned treatise would provide the offering party an opportunity to further develop the record with foundational data underlying the scientific reliability of the expert opinion. *See Exxon Corp. v. Makofski,* 116 S.W.3d 176, 180–81 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). (Objections are required at trial "so the plaintiffs would have an opportunity to cure any defects regarding reliability and present us with a fully developed record."). If a party states it has "no objection" to a learned treatise, a trial court may consider that assertion as a waiver of a reliability challenge to the learned treatise.

Arguably, the objection to the documents was initially preserved, and the plaintiffs were put on notice of any defect, by the pretrial objection to the causation testimony, which was urged again before the experts began their testimony. *See Guadalupe–Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 806–07 (Tex.2002) ("To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered.")(footnote omitted). My reading of the written objection, however, is that appellant focused largely on whether the asbestos exposure "attributable to Mobil" was sufficient to cause Mr. Bailey's cancer, rather than on whether asbestosis is a prerequisite to asbestos-caused cancer. While there are assertions of plaintiffs' burdens, and appellant attached a copy of its expert's report of no asbestosis and so no causal relationship in his opinion, I see no mention in the written objection that a diagnosis of asbestosis is a prerequisite to asbestos-caused lung cancer. The Supreme Court has said no objection need be made to incompetent evidence, and unreliable expert testimony is incompetent. *See City of Keller,* 168 S.W.3d 802, 812–13 (Tex.2005). The Court also has said that when a reliability challenge requires the

court to evaluate the underlying foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis. *Coastal Transp. Inc. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004). A scientific reliability determination should not be an unfocused task; a specific and timely objection provides focus. In the absence of a specific challenge at trial to a learned treatise, a trial court's ruling may be uninformed of a reliability problem. *Coastal Transp.,* 136 S.W.3d at 233; *see also Makofski,* 116 S.W.3d at 180–81. In my view, an objection (rather than a statement of "no objection") was required at the time a learned treatise supporting the testimony was offered if that article was considered unreliable.

The first of the three exhibits appellees cite, Plaintiffs' Exhibit 16, is a published article titled "Asbestos and the Histogenesis of Lung Carcinoma." The article is referred to in Dr. Lemen's testimony quoted above. The article analyzes the scientific evidence supporting "proposals to sort out those carcinomas due to asbestos from those tumors due to another cause." In a section titled "Must Pulmonary Fibrosis or Asbestosis Be Present in the Lung to Attribute the Carcinoma to Asbestos?", the article describes some scientific studies and then states as follows: "These divergent results are consistent with the theory that asbestosis occurs more frequently after heavy occupational exposure, but that low levels of exposure can produce a rapidly growing cancer before having time to cause asbestosis in some patients." In considering the presence of asbestos bodies on histopathological examination, the article states the following: "Although the requirement of coexistent carcinoma and asbestosis to make etiologic attribution is convenient, basic biological principles sug-

gest this approach is oversimplified and not correct."

Plaintiffs' Exhibit 17 is simply a "commentary." The commentary was admitted without objection at trial as a "learned treatise," and it includes the following statement: "Very recently, McDonald et al. [1994] have presented epidemiologic data indicating 'that workers from occupations with a high probability of exposure to asbestos are at increased risk of lung cancer even in the absence of radiological evidence of pulmonary fibrosis.'" Dr. Friedman referred to a McDonald study in his testimony, but that study is not in the record. The third document cited by appellee, admitted without objection at trial as a "learned treatise," is an epidemiology study "designed to test the hypothesis that the risk of lung cancer from asbestos exposure is confined to persons with radiographic evidence of pulmonary fibrosis." The summary of the study admitted as Plaintiffs' Exhibit 18 states: "These results suggest that asbestos is associated with lung cancer even in the absence of radiologically apparent pulmonary fibrosis."

In a footnote in its reply brief, appellant points out that these articles were admitted as learned treatises, pursuant to the learned treatise exception to the hearsay rule, and did not go back to the jury. Appellant then states, "Accordingly, because none of these articles were placed in the record prior to the trial court's admissibility ruling, those articles may not be considered by the Court." However, statements from a learned treatise may be considered by the jury as substantive evidence, though Rule 803(18) says that "[i]f admitted, the statements may be read into evidence but may not be received as exhibits." *See* Tex.R. Evid. 803(18). *See also Godsey v. State*, 989 S.W.2d 482, 492 (Tex. App.-Waco 1999, pet. ref'd); *Loven*, 831

S.W.2d at 395 ("[E]vidence contained in a learned treatise" is not "inferior to live testimony by the author of the treatise or some other expert."). When an appellate challenge is to the legal sufficiency of the evidence, and to the scientific reliability of expert testimony, an appellate court looks at all the evidence in the trial record. *See generally City of Keller*, 168 S.W.3d at 812–13; *Havner*, 953 S.W.2d at 711. The proper exclusion from the jury room of the learned treatises under Rule 803(18) does not limit our reliability review, and the trial court was not limited in its reliability determination at trial to those documents provided to the court before trial.

In *Havner*, the Supreme Court said there is more than a scintilla of evidence when the evidence, that supports the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711. The Court also stated, "Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under Robinson, and only then should a court determine from a totality of the evidence, considering all facts affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment." *Id.* at 720. In *Robinson*, the Supreme Court stated, "The factors a trial court will find helpful in determining whether the underlying theories and teachings of the proffered evidence are scientifically reliable will differ with each particular case." *Robinson*, 923 S.W.2d at 557.

I would hold on this trial record the expert testimony had sufficient reliability to be helpful to the jury in resolving the fact issue. Plaintiffs' Exhibit 16, analyzing and summarizing epidemiological and other scientific data, to my reading supports plaintiffs' experts' causation testimony, as

do Exhibits 17 and 18. The non-judicial uses made of the underlying information are factors supporting the trial court's ruling. To my reading, the scientific reliability of certain evidence in the record is not challenged on appeal by appellant. Evidence apparently not challenged on appeal includes the following: Mr. Bailey died of lung cancer; asbestos is a carcinogen that may cause lung cancer under some circumstances (the required conditions are in dispute); Mr. Bailey was exposed to asbestos at work but was never diagnosed with asbestosis, a different disease; cigarette smoke is known to cause lung cancer; Mr. Bailey smoked cigarettes; asbestos and cigarette smoke are known to act synergistically under certain conditions (the required conditions are in dispute). I would hold the evidence supporting the jury finding is more than a scintilla and therefore legally sufficient.

The trial court's judgment should not be affirmed, however. The trial court failed to submit a contributory negligence question to the jury. One was requested. There is sometimes more than one proximate cause of an injury. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 784 (Tex.2001) (citing *Travis v. City of Mesquite,* 830 S.W.2d 94,98 (Tex.1992)). Cigarette smoke is a cause of lung cancer. Whether Mr. Bailey was negligent, and whether his negligence caused the lung cancer, are controlling questions in this litigation. Trial courts are to submit to the jury controlling fact issues properly pleaded and supported by the evidence. See Tex.R. Civ. P. 278; *Triplex Communs., Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995).

Appellees argue the trial court did not err because, they say, there was no evidence Mr. Bailey had any subjective knowledge that lung cancer is "synergistically linked to smoking." In support of this assertion, appellees cite a federal district court opinion, which reasoned as follows:

> The defense of contributory negligence requires findings that the victim was negligent, or failed to act as an ordinary, prudent person, and that the victim's negligence was a proximate cause of the injury or damages. *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex. 1988). Consequently, a plaintiff's smoking may only be considered contributory negligence if the plaintiff is suffering from an asbestos-related disease which is synergisically linked to smoking. Furthermore, the defense of contributory negligence requires a showing that the plaintiff had subjective knowledge and appreciation of the danger of a product. *Terminix, Inc. v. Right Away Foods Corp.,* 771 S.W.2d 675, 682 (Tex. App.-Corpus Christi 1989, writ denied). For smoking to be considered contributory negligence, it must be shown that the plaintiff had subjective knowledge of the synergistic relationship between the asbestos-related disease and smoking and appreciated the danger of continued smoking.

*Cimino v. Raymark Indus., Inc.,* 751 F.Supp. 649, 658 (E.D.Tex.1990), *aff'd in part and rev'd in part on other grounds,* 151 F.3d 297, 335 (5th Cir.Tex.1998).

I cannot agree. A cigarette smoker need not know the scientific explanation of how cigarette smoke causes lung cancer—or whether asbestos or any other agent may increase the risk—to be at least partially responsible for lung cancer caused in whole or in part by smoking. The contributory negligence question should have been submitted to the jury. I would reverse the trial court's judgment and remand the case for a new trial because of this charge error. *See* Tex.R.App. P.

44.1(a); *Elbaor v. Smith*, 845 S.W.2d 240, 243–45 (Tex.1992).