Reversed and Rendered and Opinion filed April 3, 2008








 

Reversed
and Rendered and Opinion filed
April 3, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-01133-CV

____________

 

EXXON MOBIL CORPORATION, Appellant

 

V.

 

LOUISE ALTIMORE, Appellee

 



 

On Appeal from the 405th
District Court

Galveston County, Texas

Trial Court Cause No. 03CV0588

 



 

 O P I N I O N  

This is a personal injury case wherein appellant, Exxon
Mobil Corporation (AExxon@) seeks reversal
of a judgment for exemplary damages.

After a thorough review of the appellate record, consistent
with the standard of review described below, we find the evidence legally
insufficient to support a judgment for exemplary damages.  Accordingly, we
reverse and render judgment that appellee take nothing.

 








I.  Procedural History

Appellee=s deceased husband was employed at Exxon=s Baytown refinery
from 1942 until he retired in 1977.  He was a machinist until 1972, when he was
promoted to a  supervisory position and worked in an air-conditioned tool room
at the polyolefins unit. Appellee sued Exxon and sixty-nine other defendants
alleging, inter alia, negligence and gross negligence in connection with
injuries claimed as a result of exposure to asbestos dust brought home on her
husband=s clothes.  Before
trial, appellee settled or dismissed her claims against all defendants except
Exxon.  Following presentation of the evidence and arguments of counsel, the
jury awarded actual damages totaling $992,001.  The jury also assessed the same
amount in exemplary damages. After allocating settlement credits, the trial
court rendered judgment based solely on the jury=s assessment of
exemplary damages. 
Exxon=s post-trial motions for new trial,
remittitur and to modify the judgment were overruled by operation of law.  On appeal, Exxon
raises the following issues: (1) Exxon does not owe appellee a legal duty, (2)
appellee did not present legally or factually sufficient evidence to support a
jury finding of proximate cause, (3) appellee did not present legally or
factually sufficient evidence to support exemplary damages, (4) exemplary
damages against Exxon are unconstitutional, (5) the trial court reversibly
erred by submitting a negligent activity jury question, (6) the trial court
reversibly erred by admitting evidence of rulings by a different court that
pertained to an unrelated case, (7) the trial court reversibly erred by denying
Exxon=s request for a
mistrial after appellee=s counsel informed the jury that the
testimony of Exxon=s expert was rejected by a jury in another
case, (8) the trial court erred by limiting allocation of settlement credits to
compensatory damages. 








A three-member panel of this court previously concluded
that Exxon did not breach a cognizable legal duty because the risk of harm to
appellee was not foreseeable.  In a subsequent opinion that involved asbestos
exposure with a similar fact pattern, our sister court in Dallas reached the
same conclusion.  Alcoa Inc. v. Behringer, 235 S.W.3d 456, 458 (Tex.
App.CDallas 2007, pet.
filed).  However, the Texas Supreme Court has not, heretofore, determined
whether an employer has a legal duty (owed to the spouse of an employee) to
warn or prevent the employee from transporting toxic dust to premises occupied
by the spouse. 

Because our focus is on legal sufficiency of the evidence
to support imposition of exemplary damages, we do not address the questions of
legal duty and proximate cause.  In the interest of judicial economy, we will
assume without deciding, that Exxon breached a legal duty owed to appellee and
appellee sustained damages proximately caused by that breach.  See Tex. R. App. P. 47.1.

II.  Standard of Review

Exxon contends due process requires application of the Asome care@ standard of
review because the relevant period of time for appellee=s exposure to
asbestos was 1942 through 1977.  We disagree.  In Burk Royalty Co. v. Walls,
616 S.W.2d 911, 918B19 (Tex. 1981), the supreme court
eliminated the Asome care@ defense in
connection with suits for punitive damages against employers.  The court
distinguished statutory employer gross negligence cases from other third party
liability cases that involve assessment of punitive damages.  Id. at 919B20.  Subsequently,
in considering conduct amounting to gross negligence outside the
employer-liability generis of cases, the supreme court refused to apply the Asome care@ defense.  See
Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 923B24 (Tex. 1998). 
Accordingly, we reject Exxon=s Asome care@ defense.  








We acknowledge that circumstantial evidence will support a
judgment for malice.  Lee
Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001).  However, our
review of the evidence pertaining to exemplary damages Arequires an
examination of the events and circumstances from the viewpoint of the defendant
at the time the events occurred, without viewing the matter in hindsight.@ Transportation
Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994) (emphasis added); KPH Consolidation, Inc. v. Romero,
102 S.W.3d 135, 144 (Tex. App.CHouston [14th Dist.] 2003), aff=d, 166 S.W.3d 212 (Tex. 2005).  In determining
legal sufficiency under the clear and convincing standard, we review all of the
evidence in a light most favorable to the finding and determine whether a
reasonable trier of fact could have formed a firm belief or conviction that the
finding was true.  Southwestern Bell Tel. Co. v. Garza, 164 S.W.3d 607,
627 (Tex. 2004).  When applying the test, we must assume the factfinder
resolved disputed facts in favor of its finding if a reasonable factfinder
could do so, and disregard all evidence that a reasonable factfinder could have
disbelieved or found incredible.  In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002).  Yet, undisputed facts contradicting the verdict need not be
disregarded.  Id.  After considering all of the evidence in the manner
described, if the reviewing court decides that no reasonable jury could form
the requisite belief or conviction, it may then hold the evidence legally
insufficient.  Id.   

III.  ANALYSIS 

In submitting the jury charge, the trial court adhered to
the statutory requirements for imposition of punitive damages in cases accruing
on or after September, 1995, and filed before September 1, 2003, with the
following definitions in question number three:   

Do you find by clear and convincing evidence that the injury to Louise
Altimore resulted from malice attributable to Exxon Mobil Corporation?  

Clear and convincing evidence means the measure or degree of proof that
produces a firm belief or conviction of the truth of the allegation sought to
be established.  

Malice means an act or omission by Exxon Mobil Corporation,

 

A.      which, when viewed objectively from the
standpoint of Exxon Mobil Corporation, at the time of its occurrence, involved
an extreme degree of risk, considering the probability and magnitude of the
potential harm to others; and

 








B.      of which Exxon Mobil Corporation had actual,
subjective awareness of the risk involved, but nevertheless proceeded with
conscious indifference to the rights, safety, or welfare of others.

 

Accordingly, in reviewing this record for legal sufficiency
of the evidence, we will be guided by the two-pronged test for imposition of
exemplary damages.  Objectively, the defendant=s conduct must
involve an Aextreme degree of risk,@ which is measured
by the magnitude and probability of the anticipated injury.  Moriel, 879
S.W.2d at 23.  Subjectively, the defendant must have actual awareness of the
extreme risk created by its conduct. Id.  The extreme risk component of
gross negligence is the distinguishing feature between conduct deserving of
punishment and conduct which merely
requires restitution.  Wal-Mart
Stores, Inc. v. Alexander, 868 S.W.2d 322, 326 (Tex. 1993).  Our supreme court explained this
rationale in Moriel:

In every
negligence or gross negligence case, some injury has allegedly occurred. 
However, the magnitude of the injury may be entirely disproportionate to the
riskiness of the behavior. . . . If somebody has suffered grave injury, it may
nevertheless be the case that the behavior which caused it, viewed
prospectively and without the benefit of hindsight, created no great danger. 
In such a case, punitive damages are not appropriate.

879 S.W.2d at 23.








It is important to distinguish between the general
negligence concept of risk that family members of refinery employees will
contract a disease and an extreme degree of risk that family members of
refinery employees will sustain serious injury or death.  The Aextreme degree of
risk@ standard is a
significantly higher than the Areasonable person@ test for ordinary
negligence.  Moriel, 879 S.W.2d at 22.  To determine if acts or
omissions involve extreme risk, we must analyze the events and circumstances
from the defendant=s perspective at the time the harm
occurred without resorting to hindsight.  Id. at 23.  The concept of extreme
risk requires more than a remote possibility of injury or a high probability of
minor harm, but instead requires proof that serious injury to appellee was
likely.  Universal Servs. Co. v. Ung, 904 S.W. 2d 638, 641 (Tex.
1995).

It is
undisputed that appellee contracted mesothelioma.  Exxon=s epidemiologist,
Gary Raabe, testified that asbestos exposure is the only known cause of
mesothelioma.[1] However, consistent with our
standard of review, we cannot disregard undisputed evidence that appellee was
exposed to asbestos other than what might have been in dust particles carried
home from Exxon=s refinery.  Further, we acknowledge there is no evidence in
this record from which the jury could determine whether asbestos from the
refinery or asbestos particles in appellee=s house were a direct cause of
appellee=s mesothelioma.   

Here, we
are careful not to conflate proof of causation or reliability of scientific
evidence with legal sufficiency of the evidence to support the jury=s conclusion that Exxon exposed
appellee to an extreme degree of risk of harm.  However, we acknowledge that
the majority of appellee=s evidence regarding potential harm from exposure to asbestos
is derived from forensic medical reports and epidemiological studies. 
Accordingly, our legal sufficiency analysis is based, in part, on the amount
and quality of forensic evidence published or available during the relevant
period of time, that will support the two-pronged test for imposition of
exemplary damages.  

 

 








Viewed
objectively, was there clear and convincing evidence that Exxon subjected
appellee to an extreme risk of harm? 

1.       Appellee=s contentions

In support of her claim that she was subjected to an
extreme degree of risk of harm, appellee contends: (1) The risks associated
with asbestos exposure have been well known since the 1930's; (2) By 1935,
scientists discovered cancer in textile factory workers; (3) In 1935 the Public
Health Service issued multiple announcements regarding the danger associated
with exposure to asbestos; (4) By 1937, Exxon=s internal
documents reveal its awareness of the harm that could come to workers exposed
to asbestos through visible and invisible dust; (5) During the early 1940's,
Exxon knew that exposure to asbestos could cause death; (6) During the latter
part of the 1940's, Exxon employees authored confidential memoranda acknowledging
asbestos exposure could cause lung cancer; (7) By 1955, Exxon=s expert
recognized a relationship between lung cancer and asbestos; (8) In 1958, the
Texas legislature enacted laws to protect employees from exposure to asbestos;
(9) By 1963, an epidemiological study of miners and others who lived near a
crocidolite mine in South Africa revealed a relationship between exposure to
asbestos and mesothelioma; (10) In 1964, Exxon=s Medical Research
Division reported that Afamilies of asbestos workers were getting
sick as the result of brushing the fibers off their clothing.@

2.       Asbestos
at Baytown Refinery








Appellee=s husband, Mike Altimore, was employed at
the Exxon Baytown refinery from 1942 until 1977. Most of his tenure was spent
as a machinist. Exxon avers that Mr. Altimore transferred to the polyolefins
unit at the chemical plant in 1959. The record is unclear relative to the exact date; however, we
estimate that he transferred to the polyolefins unit in the early 1960's. He
was promoted to a supervisory position and assigned to an air-conditioned tool
room at the polyolefins unit in 1972.  After this promotion, Mr. Altimore did not work in dusty conditions.  Mr. Altimore remained in that
position until he retired in 1977.[2]  Accordingly, the
relevant period of time for this court to analyze Exxon=s conduct relative
to appellee begins in 1942 and ends in 1972. 

It is undisputed that Baytown refinery employees used
asbestos for pipe insulation, gaskets, fire brick, cement and packing
materials. Mr. Altimore=s fellow employees, Roosevelt Boullion and
Roy Calma, testified that he was exposed to dust while working around insulated
pipes.  As machinists, they used hammers to knock insulation from pumps,
turbines, centrifuges, motors and flanges.  From time to time, they worked
below other employees who were either removing or replacing insulation.  Calma
stated that he and Mr. Altimore regularly went home with visible dust on their
clothes.  Jesse Stovall was Mr. Altimore=s supervisor.  He
acknowledged that machinists would create dust clouds when they removed insulation
from equipment.  He also testified that dust from insulation settled on workers= clothes.  Appellee=s expert, Dr. Richard Lemen, testified regarding the danger
to refinery workers exposed to asbestos.[3] 
He opined that Mr. Altimore was exposed to toxic levels of asbestos because the
dust was visible in the work atmosphere.  However, we cannot disregard Stovall=s testimony that the polyolefins unit
generates Afood grade@ white dust and  Dr. Lemen=s admission regarding the absence of
data sufficient to accurately measure Mr. Altimore=s cumulative asbestos exposure.
Further, in determining whether the risk of injury was extreme, we cannot
disregard Dr. Lemen=s admission that any attempt to calculate the degree of
exposure would be sheer speculation.

 








3.         Scientists= Knowledge of the Risk to Refinery
Workers

A
significant portion of the scientific evidence was based on work environment
studies. Consequently, we review the evidence to determine whether members of
the scientific community had knowledge that there was a risk of harm to refinery
workers during the relevant time period.[4]


By the
time this case was tried, researchers could not identify a level of asbestos
exposure below which there is no risk for developing cancer.  Dr. Gary Raabe,
Exxon=s epidemiologist, testified that
asbestos exposure was the only verifiable cause of mesothelioma. Moreover,
representatives of the Occupational Safety and Health Administration (AOSHA@) had admitted they were not aware of
a toxic substance that had been more clearly demonstrated to have a detrimental
health effect on humans than asbestos.  However, the record indicates that
research was gradual, and knowledge regarding the risks associated with
asbestos exposure increased over a lengthy period of time.         








Dr.
Lemen provided a detailed history regarding progress within the scientific
community in discovering potential danger and evaluating the risks of injury
associated with exposure to asbestos.
 It was his opinion that by 1942, there had been significant
advances in asbestos research.  He referred to epidemiological studies
confirming the hypothesis that asbestos exposure could cause disease,
specifically asbestosis.[5]  By 1942, the
United States Public Health Service (AUSPHS@) was involved in asbestos research.[6] 
Scientists in Great Britain and the United States were engaged in studies
linking lung cancer to asbestos exposure.[7] 
The USPHS alerted the public to the fact that prolonged exposure to asbestos
dust caused pulmonary fibrosis, and recommended safety precautions. Such
recommendations included controlling levels of dust that contain toxic
substances, and limiting exposure to a Threshold Limit Value (ATLV@) of five million particles per cubic
foot, a specific level considered to be safe.  

In 1946, the American Council of
Governmental Industrial Hygienists adopted the five million particles per cubic
foot standard, which was reported in a 1938 publication by the USPHS. The
Fleisher-Drinker study of asbestos insulation workers in United States Navy
shipyards was also published in 1946.  This was the first major study that
involved workers using asbestos products as opposed to workers in
asbestos mines or asbestos product manufacturing plants.  Researchers concluded
that asbestos insulation workers were not subjected to dangerous levels of
asbestos and the five million particles per cubic foot standard appeared to be
a safe level of exposure.  








In 1955,
British researcher, Dr. Richard Doll, published an epidemiological study in
which he concluded that there was a causal relationship between asbestos
exposure and lung cancer. In 1957, a Texas state occupational health agency
promulgated a regulation limiting asbestos exposure to five million particles
per cubic foot for all industries operating in Texas which was subsequently
adopted by the legislature.  Act of June 19, 1965, 59th Leg., R.S.
ch. 687, 1965 Tex. Gen. Laws 1583, 83, repealed by  Act of June 18,
1967, 60th Leg., R.S. ch. 727, ' 17, 1967 Tex. Gen. Laws 1941, 52
(current version at Tex. Occ. Code Ann. '' 1954.001B.403 (Vernon 2004).  

In 1964,
the first epidemiological study that pertained to asbestos products end users
was prepared by Drs. I. J. Selikoff, E. C. Hammond, and J. Churg, entitled: AThe Occurrence of Asbestosis Among
Insulation Workers in the United States.@  They reported an increased
incidence of lung cancer and mesothelioma, and concluded that there is a causal
relationship between these diseases and asbestos exposure.  In addition, they
reported cancer among carpenters, steam fitters, and other building trade
workers indirectly exposed to asbestos insulation.  Also in 1964, Dr. William
Marr, a shipyard doctor, published a study of insulators in the Industrial
Hygiene Journal.  Dr. Marr reported the insulators were not exposed at
levels above the TLV of five million particles per cubic foot, yet workers were
still contracting asbestos-related diseases.  According to Dr. Lemen, the
significance of Dr. Marr=s study was that the TLV may not be protective of workers. 

In 1965,
Dr. Selikoff, Dr. Hammond, and Dr. Churg published a study in which they
concluded that mesothelioma was a disease caused by asbestos in multiple work
environments.  The authors questioned whether the TLV of five million particles
per cubic foot was protective of workers because more than ten percent of the
workers died as a result of asbestos-related disease.  Because of lingering
doubt about the relationship between asbestos exposure and lung disease, Dr.
Selikoff and other experts urged researchers to conduct more epidemiological
studies. 








According
to Dr. Lemen, 1972 was a crucial year in the history of asbestos research.  By
1972, experts agreed that a certain degree of exposure to asbestos could cause
asbestosis or cancer.  After this postulate was generally accepted, the debate
focused on what constituted a safe level of exposure for workers.  In June of
1972, OSHA released its initial asbestos exposure standard: five fibers per
cubic centimeter over an eight hour time-weighted average.  This was the first
asbestos exposure standard to cover all industries on a nationwide basis. 
Under these new regulations, workers were prohibited from taking their work
clothes home to be laundered if they had been exposed to asbestos.  Also in
1972, while it had insufficient information to issue a single standard
protective of all asbestos-related disease, the National Institute for
Occupational Safety and Health (ANIOSH@) proposed an asbestos exposure
standard of two fibers per cubic centimeter.[8] 
Therefore, during the relevant time period, 1942 to 1972, there was a consensus
within the scientific community that there was a measurably safe level of
exposure to asbestos.

4.         Asbestos in appellee=s home

Appellee
testified that Mr. Altimore regularly came home from the plant with dust on his
clothes.  Appellee would shake the dust out of her husband=s clothes before
placing them in the washing machine.  Dr. Lemen opined that Mr. Altimore brought toxic levels of
asbestos home on his work clothes.  Both Dr. Jay Segarra and Dr. Samuel Hammar
opined that appellee was exposed to asbestos sufficient to cause mesothelioma.[9]  
However, in considering whether Exxon=s conduct created an extreme degree
of risk to appellee during the relevant period of time, we cannot disregard the
fact that many manufacturers and end users were regularly handling and
marketing asbestos products. Appellee=s home was built with asbestos
products in her ceiling tiles, attic insulation, siding, and fireplace grates. 
She also had contact with asbestos through application of household repair
products. 

5.         Scientists= Knowledge of the Risk to Appellee








Appellee implicitly asks the court to conclude that
purported awareness of an extreme risk to refinery employees equates with
awareness of an extreme risk to their spouses.[10] 
After presenting a plethora of scientific studies regarding asbestos in the
workplace, appellee
refers this court to evidence that scientists reported family members of
workers exposed to asbestos were getting sick.  Dr. Lemen described Dr. J. C.
Wagner=s article entitled ADiffuse Pleural Mesothelioma and
Asbestos Exposure in the Northwestern Cape Province,@ which was published in 1963 by the
British Journal of Industrial Medicine.  Dr. Wagner stated: Awithout a doubt mesothelioma is
causally associated with asbestos.@  Dr. Lemen explained that Dr. Wagner
Aput together a series of cases that
he had seen in his clinic in South Africa.@  All the workers mentioned in the
article were miners of crocidolite, one of the fiber types of asbestos.  Dr.
Wagner concluded that the miners, and their family members who lived around the
mines, were at risk for developing disease.  

Appellee
also refers to a summary of a case study reported by Exxon=s Medical Research Division by Dr. R.
E. Eckhardt.  Dr. Eckhardt published a summary of the Conference on Biological
Effects of Asbestos,[11] in which he
reported that J. G. Thomson had written a paper entitled, AAsbestos and the Urban Dweller.@  Dr. Eckhardt noted the author Asuggests that the families of
asbestos workers may develop asbestosis as the result of brushing the fibers
off their clothing[.]@  Exxon=s editor reached the following conclusion: AIt would appear, therefore, that very
minor exposures to asbestos may result in pulmonary changes but that these do not occur until long
after the initial exposure, perhaps in the vicinity of 40 years.@        








Notwithstanding
our conclusion regarding the relevant period of time to analyze legal
sufficiency, appellee relies on an internal memorandum written in 1974 by Fred
Venable, Exxon=s industrial hygienist.  In the memorandum, Venable reported the results
of air samples collected from an area where employees were removing asbestos on
October 8-9, 1974.  Venable expressed concern about Athe clothing contamination by
asbestos dust which is almost unavoidable in this scope of removal operations.@  He stated, ANot only are we violating the
existing regulations concerning clothing by not providing such clothing and
laundering it, but we are also failing to protect our employees and the
families of our employees from asbestos exposure.@  By 1974, many scientists
acknowledged that asbestos posed a risk outside the workplace.  Venable noted
that while Exxon had embarked upon an asbestos control program with Asome degree of complacency regarding
the health of our employees, there has been considerable change in thinking, at
least on the part of this writer, because of the appearance of two cases of
mesothelioma in recent months among Exxon Company employees.@ 

At the conclusion of his direct
testimony, Dr. Lemen opined that Exxon acted with Aan extreme degree of risk and
unconscious [sic] indifference to the rights and
safety of Mr. Altimore[.]@  First, we note that Exxon=s counsel objected to the speculative
nature of this portion of Dr. Lemen=s testimony.   Second, notwithstanding
Exxon=s misquotation on page 36 of its
original brief, Dr. Lemen did not testify that Exxon acted with an extreme
degree of risk toward appellee.  Third, the assumptions on which the
question was based are not supported by the evidence.  Appellee=s counsel asked Lemen to assume Exxon
had knowledge that employees= families could be Aput at risk.@  However, on cross-examination
Lemen  admitted that the medical evidence in the 1960's was conflicting.  He
also acknowledged that as late as 1972, scientist believed exposure below a
certain dosage did not pose a danger. 








Dr.
Lemen could have based his opinion on the Venable memorandum and general
knowledge that asbestos could cause lung cancer.  However, the grounds for this
assumption are not relevant to Exxon=s knowledge of an extreme degree of
risk for serious injury to appellee.  As stated earlier, the Venable memorandum
was not published until 1974, two years after Mr. Altimore began to work in an
air-conditioned environment.  Further, Exxon=s general knowledge of a risk to
employees is no evidence that Exxon had knowledge of an extreme degree of risk
to family members of employees.  Because the assumptions that underpin Dr.
Lemen=s testimony were contrary to the
evidence, that testimony amounts to no evidence of malice.  See Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 499B500 (Tex. 1995).  We also conclude
that Dr. Lemen=s opinion was not based on well-founded scientific methodology, therefore
it is unreliable and incompetent to support a judgment for exemplary damages. See
Merrell Dow Pharms., Inc. v. Havner, 953 S.W. 2d 706, 712 (Tex. 1997). 

We
cannot disregard Dr. Hammar=s testimony that asbestos and mesothelioma have a dose
response relationship.  The more asbestos that accumulates in the lungs, the
higher the chances of getting an asbestos-related disease, such as mesothelioma. 
Moreover, in determining whether Exxon subjected appellee to an extreme degree
of risk, we cannot disregard appellee=s failure to produce any reliable
scientific data to support her Asufficient exposure@ theory.[12] 
Here, the jury did not have comparative epidemiological studies or expert
testimony delineating the difference between a general danger versus an extreme
risk to appellee.

6. 
Conclusion-Objective Prong








First, we
reiterate that most of appellee=s evidence regarding the risk of injury from  asbestos
exposure is derived from epidemiological studies of various work environments. 
Second, during the relevant period of time there was a consensus among
scientists that there was a safe level of exposure to asbestos in the
workplace. Third, appellee did not present a single medical report or
epidemiological study (available during the relevant period of time) in which
researchers concluded that family members of refinery employees were exposed to
an extreme degree of risk. Fourth, considering the status of
epidemiology during the relevant period of time, appellee failed to produce any
evidence, either circumstantial or direct, that Mrs. Altimore was exposed to an
extreme risk given the dosage or amount of asbestos fiber on her husband=s clothes.  Fifth, none of appellee=s experts opined (with proper
predicates) that Exxon exposed her to an extreme degree of risk of harm
during the relevant period of time. Sixth, while there had been reported cases of
mesothelioma among Exxon employees in 1974, the record contains no evidence that any family member of an
Exxon Baytown refinery employee developed mesothelioma during the relevant
period of time.[13]  Seventh,
because appellee=s evidence is derived mainly from epidemiological studies, we
cannot disregard appellant=s evidence regarding the lack of consensus within the
scientific community, during the relevant period of time, that family members
of refinery workers were subjected to any degree of risk.  Eighth, even
if this record contained some evidence of a risk to appellee, evidence of
simple negligence is not evidence of gross negligence.  Lee Lewis Constr.,
70 S.W.3d at 785. 

After
viewing all of the evidence in the light most favorable to the verdict, we
cannot conclude that a reasonable trier of fact could form a firm belief or
conviction, when viewed objectively from Exxon=s standpoint, there was an extreme
degree of risk of serious injury to appellee during the relevant period of
time. Here, the magnitude of appellee=s injury is disproportionate to the
riskiness of Exxon=s behavior.  Even if Exxon=s acts or omissions caused appellee=s injury, when viewed prospectively
and without benefit of hindsight, Exxon=s conduct did not create an extreme
degree of risk that appellee would sustain serious injury. Moriel, 879
S.W.2d at 23.

 








Because we conclude the evidence is legally insufficient to
support the first prong of the test for a finding of malice, we sustain Exxon=s third issue.  See
Dillard Dep=t Stores, Inc. v. Silva, 148 S.W.3d 370,
374 (Tex. 2004). Accordingly, we reverse the trial court=s award of
exemplary damages and render judgment that appellee take nothing.

 

 

 

/s/      Charles Seymore

Justice

 

 

Judgment rendered and Opinion filed
April 3, 2008.

Panel consists of Chief Justice
Hedges and Justice Seymore and Senior Justice Murphy. *

 

 

 

 









[1]  Asbestosis and mesothelioma are two separate
diseases, each caused by exposure to asbestos.  Asbestosis is a non-cancerous
scarring of the lung tissue caused by the inhalation of asbestos fibers.  As
more asbestos fibers are inhaled, the scarring of the lungs increases and
breathing capacity decreases.  If the scarring is severe enough, the disease
may prove fatal.  Mesothelioma is a rare and almost universally fatal form of
cancer where tumors develop in the serosal lining of the body cavities with
pleural mesothelioma being the most common.  With pleural mesothelioma the
tumors develop not in the lungs, but in the pleura lining the lungs.  The
tumors then spread in a diffuse manner into the surrounding areas of the body. 
Death usually occurs within nine to twelve months of diagnosis.





[2]   Mr. Altimore died in 1992.  There is no evidence
that his death was caused by mesothelioma.





[3]  Dr. Lemen earned his post-graduate degrees in
epidemiology.  Most of his career has been dedicated to the study and
prevention of occupationally-related diseases and injuries.  He was employed by
the United States Public Health Service (AUSPHS@) from 1970 until he retired in 1996.  He was promoted
to the rank of rear admiral in the USPHS.  He also served as Assistant Surgeon
General and Deputy Director of the National Institute For Occupational Safety
and Health (ANIOSH@).





[4]  We acknowledge that, during all times material to
our inquiry, the majority, if not all, of the scientific community, postulated
that the risk of harm, relative to asbestos exposure, differed based on whether
a person was exposed to asbestos through mining, manufacturing or as an end
user of asbestos products.  





[5]  E.R.A.
Merewether & C. W. Price, Report on Effects of Asbestos Dust on the Lungs
and Dust Suppression in the Asbestos Industry (London, H.M. Stationary
Office 1930).  Merewether and Price studied asbestos textile workers in Great
Britain.  They concluded that asbestos exposure caused asbestosis.  They also
considered workers other than in the manufacturing areas and concluded that
asbestos exposure at the same levels would be a hazard to those workers using
asbestos products.  Merewether and Price concluded that workers should be given
a Asane appreciation of the risk.@ They opined that workers  who understand the risks
associated with asbestos will take necessary precautions to protect themselves.





[6]  United States
Public Health Service, Effects of the Inhalation of Asbestos Dust on the Lungs
of Asbestos Workers (1935).   In addition, Dr. Dreessen of the USPHS
conducted a study of asbestos textile workers along the eastern coast of the
United States and published his study in 1938.  Based on these studies, he
provided an estimated level of exposure that would not be injurious.





[7]  S. Roodhouse Gloyne, Two Cases of Squamous
Carcinoma of the Lung Occurring in Asbestosis,  Tubercle 5, 5-10 (1935).  Dr. Gloyne reported two persons
with non-fatal asbestosis who developed carcinoma of the lung.  Dr. Gloyne=s study focused on workers in the asbestos textile
manufacturing industry.





[8]  Both the OSHA and NIOSH standards were primarily
designed to protect against asbestosis. 





[9]  Dr. Sam Hammar is a board certified pathologist. 
Dr. Jay Segarra is a pulmonologist.





[10]  The relevant anecdotal medical reports and
epidemiological studies in this record do not support  appellee=s implicit contention that the risk of injury from
exposure to asbestos brought home by her husband is the same degree of risk to
employees working on premises at the Baytown refinery and chemical plants. 
During the relevant period of time, researchers focused on the risk of exposure
to asbestos in different trades and work environments.  





[11]  <<R. E. Eckhardt>>, <<Exxon
Medical Research Division to Exxon Corp., Esso Research and Engineering Company
Summary of the Conference of Biological Effects of Asbestos>> (1964).





[12]  We have assumed Exxon breached a legal duty which
caused appellee=s injury. However, in consideration of the fact that
appellee did not present evidence of Aspecific@ causation, she would have formidable obstacles in
proving causation.  See Frias v. Atlantic Richfield Co., 104 S.W. 3d
925, 928-31 (Tex. App.BHouston [14th Dist.] 2003, no pet.); see also Borg-Warner
Corp. v. Flores, 232 S.W.3d 765 (Tex. 2007) (plaintiff contended he
sustained injury because of exposure to asbestos, however, the court concluded
that he failed to carry his burden of proof on causation because he did not
present quantitative evidence of Adose@ and evidence that the Adose@ was a significant contributing factor to the cause of
his disease). We acknowledge that appellee claims injury because of
mesothelioma, not asbestosis.  However, on this record, appellee would have
similar hurdles because she relies on epidemiological studies to prove
causation.





[13]  The Venable memorandum is not reliable evidence of
an extreme degree of risk because the air samples that form the bases of
Venable=s opinions were not gathered during the relevant
period of time.  Moreover, given appellee=s
reliance on epidemiological studies, we expect that there would be at least one
previous manifestation of mesothelioma in the spouse of a refinery worker
before a jury could form a firm belief or conviction that appellee was
subjected to an extreme risk. 





* 
Senior Justice Paul C. Murphy sitting by assignment.