In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00272-CV

_____

BEAU MCBETH AND ERICA MCBETH, Appellants

V.

SERVPRO INDUSTRIES, INC. AND S&R OPERATIONS, INC. D/B/A
SERVPRO OF THE WOODLANDS/CONROE,[1] Appellees

On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 20-02-02639-CV

MEMORANDUM OPINION

Beau and Erica McBeth (collectively "the McBeths;" singularly "Beau" and
"Erica") sued SERVPRO Industries, Inc. ("Servpro") and its franchisee, S&R
Operations, Inc. d/b/a SERVPRO of the Woodlands/Conroe ("S&R"), claiming that
S&R's alleged failure to properly identify and remediate mold in their house caused

---

[1]Although many documents in the record spell Defendants as "Servepro," we
have corrected the spelling to "Servpro."

1

them and their children to sustain personal injuries and property damage.[2, 3, 4] The McBeths claim Texas Deceptive Trade Practices Act ("DTPA") violations, in addition to alleging breach of contract, fraud, negligence, and gross negligence against these Defendants. *See* Tex. Bus. & Com. Code Ann. § 17.46.

The jury answered some liability and damage questions in the McBeths' favor and the trial court accepted the verdict. More specifically, the jury answered liability questions in the McBeths' favor as to negligence and the DTPA, only. However, the jury found in Servpro's and S&R's favor as to fraud and gross negligence. Although the jury found that Servpro and S&R knowingly violated the DTPA, they did not do so intentionally.

Servpro and S&R filed a Motion for Judgment Notwithstanding the Verdict, arguing that the economic loss rule applied to the case and that the McBeths presented legally insufficient evidence to support their favorable verdict and specifically mentioned the lack of evidence of causation. The trial court granted the Motion but did not specify the basis of its ruling.

---

[2]In their Second Amended Petition, Plaintiffs also sued the Aggie Inspector Group, LLC (the mold assessor they initially retained to evaluate the condition of their house) and EMSL Analytical, Inc., (the laboratory that analyzed the samples from that initial assessment) but nonsuited these defendants before trial.

[3]Plaintiffs abandoned their personal injury claims and proceeded to trial on their property damage claims.

[4]For ease of reference, we use Beau and Erica McBeth's first names.

The McBeths now appeal the trial court's judgment, arguing that the trial court erred in granting a judgment non obstante veredicto ("JNOV") after the jury returned a verdict in their favor. Specifically, they contend that (1) the record contained "competent uncontroverted evidence" to sustain the jury's verdict and (2) that the economic loss rule did not apply to their DTPA claim. Appellees Servpro and S&R raised cross-points, but our disposition of the McBeths' arguments renders it unnecessary to address those cross-points. *See* Tex. R. App. P. 47.1.

Finding no reversible error, we affirm the trial court's judgment for Appellees.

## I. Background Information and Trial Evidence

Servpro is an international franchisor that contracts with individual franchisee companies like S&R that are in the business of cleaning or remediating flood damage, fire damage, mold damage, and the like. S&R, like many of these individually owned franchises, also offers general cleaning services.

In late June 2017, the McBeths purchased a house in The Woodlands. They planned to update the flooring, among other things, before moving into the house. For that reason, their flooring contractor, Daniel Lanni, was removing the old carpet and carpet padding shortly after the McBeths closed on the property. When Lanni removed the padding, he discovered a "mud-like substance" on the subfloor, and notified Beau McBeth that he could not continue to work until the McBeths

addressed this problem. Neither the McBeths nor S&R scientifically tested this substance; consequently, it was never identified with certainty. We therefore refer to it as a "mud-like substance," or an "unknown substance," which is the terminology used throughout much of the record. Due to this mud-like substance, Beau contacted Servpro, and his information was transmitted to Servpro's local franchisee, S&R. Beau described the problem, and the following day, June 29, 2017, S&R personnel cleaned the "mud-like substance" from the subfloor. Pursuant to S&R's standard procedure, its crew also sprayed the cleaned areas with Sporicidin, a disinfecting, antimicrobial, and antifungal agent.

Although there is some disagreement about what services Beau sought when he spoke with S&R on June 28, 2017, he testified that he had not seen mold before, and he told them based on the pictures, "it was some substance that looked like mud[.]" The service contract did not indicate any services or charges for mold testing or remediation. The parties agreed that S&R did not provide either mold assessment or mold remediation. Sometime after moving into the house, and about sixteen months after Servpro cleaned the mud-like substance off the subfloors, the McBeths and their children began experiencing various health problems. In October 2018, the McBeths questioned whether their health problems might be due to mold exposure; they consequently retained a mold assessment company to evaluate the mold levels in their home. That assessment company found low levels of mold but did not

4

indicate that the mold was hazardous to the McBeths' health. In June 2019, two years after S&R cleaned the McBeths' subfloors, a different mold assessment company, Texas Mold Inspectors ("TMI"), found high mold levels in the house and advised the McBeths to move out immediately, which they did. Since TMI indicated that the McBeths' furniture, clothing, and other belongings would be contaminated with mold, they left those items behind in the house they vacated. The estimated cost of mold remediation exceeded the value of the house.

The McBeths therefore sold the property at a loss and eventually bought a different house.[5] They allege Servpro and S&R are responsible for their loss because S&R did not look for, identify, or warn them of any mold problem in the house in June 2017.

We summarize below the testimony relevant to this appeal.

**A. Joshua Rachal's Testimony**

Joshua Rachal ("Rachal"), described his construction and sales experience before becoming a licensed mold assessor, recalling that he was a construction laborer for two years, and "had a remodeling company" that gained him five years' experience. He testified that his construction experience made him a more effective

---

[5]The McBeths sold the house to a buyer who performed his own mold remediation for a lower cost than was estimated for the McBeths, and who later resold the house at a profit.

mold assessor because understanding how a house is constructed and "how a home is working as a system[,]" enables him to understand whether there are construction defects that could allow mold to form. At another time, Rachal worked as an outside sales representative, selling "high-end custom replacement windows, sun rooms, home exteriors, roofing systems, and replacement front doors." According to Rachal, sales, like construction, improved his ability to be a mold assessor because the training he received in that position enabled him to understand how to properly install the products he sold. Consequently, Rachal testified, he knew how to identify incorrect installation issues that might permit water to enter a house.

Rachal became a licensed mold assessor in 2016. His family's experience with mold motivated him to make this career shift. In 2016 or 2017, Rachal and his wife formed TMI. Since forming the company, he has performed thousands of mold assessments.

TMI first assessed the McBeths' home in June 2019. Rachal described the testing methods used at the McBeths' house, explaining that TMI sampled both room air and wall cavities in multiple areas, including the garage, bedrooms, kitchen, staircase, and other locations. TMI also sampled exterior air for comparison purposes. According to Rachal's interpretation of Plaintiff's Exhibit 38, a laboratory report showing the test results of samples taken from the McBeths' house, TMI found toxic mold in the house, but none outside it. Specifically, the laboratory report

6

of the samples taken from the McBeths' house revealed Chaetomium, a "slime mold," in a garage ceiling wall cavity, as well as "Penicillium/Aspergillis-like" mold. In a bedroom wall cavity, the report identified Stachybotrys, Alternaria, and additional Penicillium/Aspergillis-like spores. Rachal characterized all these molds as toxigenic and potentially carcinogenic. According to Rachal's 2021 Mold Assessment Report, "[t]he sub-flooring and staircase, within this home, has [sic] been experiencing systemic water intrusion for many years preceding the date of, TMI's, assessment." Although Rachal did not define "many years," he acknowledged that not all mold is toxic. Rachal explained "slime mold" as those molds that grow only in "100 percent wet, saturated" building materials. He testified that mold requires three ingredients to grow: food, oxygen, and water. Rachal therefore noted that the mold remediation process must not only eliminate the mold but must identify and rectify the water intrusion sources to prevent mold regrowth.

Although Rachal is a mold assessor rather than a mold remediation contractor, he described how these specialists work together to serve their clients. The mold assessor, such as Rachal, first identifies the mold and its source, and writes a remediation protocol. The mold remediation contractor then eliminates the mold by following the protocol. The protocol Rachal drafted for the McBeths called for removing drywall, insulation, fixtures, air ducts, and other building materials and components from the affected areas of the house. The protocol further required

7

discarding most porous items, such as clothing and upholstered furniture and either discarding or remediating non-porous items. Rachal recommended, however, that even non-porous items be discarded because the remediation cost exceeded those items' value. To illustrate his point, Rachal noted that remediating a plate would cost $75.00 due to the cost of performing a sample on it.

After the contractor completes the remediation process, he notifies the mold assessor, who verifies through inspection and additional sampling that the remediator has eliminated the mold.

When asked about the photographs taken in 2017, at the time of S&R's services, Rachal testified that had he been present at the time these pictures were taken, he would have advised the McBeths to have the mud-like substance tested "in order to know exactly what it is." It did not look to Rachal like mud. When testifying about the pictures taken in 2019 as part of TMI's mold investigation, Rachal identified several places purporting to show rust, water stains from condensation, and resulting mold.

Rachal testified that Sporicidin, the product S&R used at the McBeths' house, is used to kill viruses, bacteria, and mold. According to Rachal, however, it is counterproductive to use a chemical to kill mold because the mold reacts to the chemical by "go[ing] crazy[]" and producing mycotoxins.

The Aggie Inspector Group ("Aggies") assessed the McBeths' house for mold on October 16, 2018, eight months before TMI assessed the property. Rachal reviewed the Aggies' October 19, 2018 report and concluded that some of the results should have shown that mold levels were "elevated" as opposed to "slightly elevated."

**B. Daniel Lanni's Testimony**

Daniel Lanni ("Lanni") testified that he was the McBeths' flooring contractor in 2017. Before removing the old carpet, he performed "quite extensive remodeling work[,]" including installing new tile and redoing the kitchen. When his crew removed the carpet, he "noticed the issues." He therefore notified Beau McBeth that there was "mold" that "needed a remediation" before Lanni could proceed with his work. Lanni also took photographs of the substance on the subfloor. Lanni testified that the substance he called "mold" was neither dirt nor carpet glue. He believed that the "mold" may have originated from a toilet leak in an adjacent bathroom. The stain from the apparent plumbing leak was dry when Lanni mentioned it to the McBeths.

When asked about his undated declaration, which references an "unknown substance" and does not mention "mold," Lanni explained this inconsistency by stating that at the time he signed the declaration, he "didn't know a hundred percent that it was mold but it -- I'm not an expert in mold."

9

After Lanni and Beau discussed the problem, Beau told Lanni that he had retained "Servpro" to take care of the issue. Beau later told Lanni that "Servpro" had remedied the issue and Lanni therefore could complete the carpet replacement. Beau did not, however, provide Lanni a mold remediation certificate, and Lanni did not request one. When Lanni returned to the McBeths' house after S&R had completed its work, the floor "looked a lot better[,]" but Lanni noticed some "dark spots[,]" that "looked like there was mold there" and therefore did not "think it was completely cleaned." Recognizing, however, that he is not a mold expert, Lanni permitted his crew to lay the carpet, despite his opinion that there remained a "clear sign of mold," that a "good technician would notice[,]" that there was a toilet on the opposite wall, and the toilet might leak and contribute to water damage.

Lanni confirmed that his crew worked on the ground floor of the McBeth house for months before he discovered the unknown substance under the upstairs carpet. During that time, he did not see any water stains on the ground floor ceiling; had he noticed any such stains, he would have told the McBeths immediately.

**C. Beau McBeth's Testimony**

Beau McBeth testified that he and his wife, Erica, bought the house for $420,000.00 in June 2017. He believed the house was sixteen years old when they bought it. He estimated that he spent an additional $125,000.00 on interior remodeling and about $40,000.00 on the home's exterior. Although there was no

10

apparent reason to expect problems with the house, the McBeths planned to renovate certain areas, including the floors and the kitchen, before moving in. Consequently, the flooring contractor, Daniel Lanni, began work shortly after the closing.

Lanni began the renovation on the ground floor by removing flooring and removing the kitchen island. When Lanni started working on the second floor, he removed the carpet. Upon doing so, Lanni discovered "something on the floors" and advised Beau that the work would be interrupted and he "needed to have someone come out and take care of it." Lanni sent Beau photographs of the substance on the subfloors and advised Beau of a possible recent water leak in a bathroom, but Beau did not recall Lanni saying anything about the nature of the substance in the pictures.

After hearing from Lanni, Beau searched online for companies able to perform "restoration services[]" and chose S&R based on the content of Servpro's marketing materials as displayed "around Houston[]" and on its website. Beau agreed that it was important to him to find a company that could do assessment and remediation. He remembered noticing the explanations of Servpro's processes but did not recall specific details about those services. Later in his testimony, however, Beau stated that Servpro's website set forth a multi-step process. According to Beau's recollection, the website indicated that the initial step was "a site survey and assessment to determine what needed to be done," and the process would be explained to him. Beau further recalled the website stating that the technicians "were

11

highly skilled and trained to perform the assessment[]" and would recommend "what we needed to be able to continue to work and move in safely." He denied having told either Servpro or S&R that he needed only a cleaning. He did recall Servpro/S&R's website saying that mold can begin to grow within twenty-four to forty-eight hours, so "action should be taken." In addition, Beau read portions of the website that "[i]t can take less than 72 hours for mold to spread throughout your home, which may result in negative health effects to your family, as well as damage to your property." He did not recall reading the legal disclaimers on the website. Beau said that SERVPRO offered "assessments" and that the December 2019 printout of Servpro's website contained in his Exhibits 1-4 did not appear different from the website he viewed in June 2017.

When Beau discussed his situation with Servpro or S&R in June 2017, he told them that the substance "looked like mud[.]" He did not mention mold at that time, nor did he recall discussing either "testing," or his concern that it might be mold. He did remember that when he met S&R at the house the next day, he realized the damage was more extensive than he had anticipated, and he noticed "obvious water stains." Beau also remembered discussing the situation with Jeremy, an S&R employee, but stated that Jeremy told him that because the stain was dry, "no further action was necessary." Beau and Jeremy also discussed the cleaning service and the product, Sporicidin, that S&R would use on the floors. Beau testified that although

12

he considered the mud-like substance "questionable" and "hadn't seen mud that looked like that[,]" he did not recall discussing testing or mold when S&R came to the house on June 29, 2017. At that time, Beau did not know that S&R had no mold assessment license and only one licensed mold remediator on its staff; he testified that had he known that, he would not have hired S&R/Servpro if he "knew it was mold[.]"

Beau doubted that he would have hired Servpro if he believed that only a general cleaning were necessary. He testified that he relied on Servpro's advertisement that they would send highly trained professionals to do what was needed. He also relied on S&R's representation that the Sporicidin would clear the house of any issues and that the water damage was nothing to worry about.

Beau reviewed the before-and-after photographs attached to S&R's job report, Plaintiffs' Exhibit 27, and confirmed that the floors appeared "definitely much cleaner than what it was when I got there the first time."

The McBeths eventually completed their renovations and moved into the house. In late 2018, approximately sixteen months after Servpro cleaned the subfloors, all five McBeth family members living in the house began experiencing health problems. At first, Erica experienced "skin irritations" and "debilitating migraine headaches[]" and Beau began struggling with breathing difficulties. The children also exhibited health conditions, including skin sores, dental problems, and

behavioral changes. During the two years between June 2017, when S&R cleaned the subfloors, and 2019, when TMI determined that the house contained unsafe mold levels, the McBeths detected no mold smell or any other sign that there might be a mold problem in the house.

When the McBeths suspected that they might have a mold problem, they retained the Aggie Inspector Group, a licensed mold assessment consultant, to perform a mold assessment. This assessment company found mold but indicated that the molds detected in the McBeths' house were within acceptable levels. Over the ensuing months, the McBeths' symptoms worsened. When medical testing revealed their symptoms "were connected to environmental toxins and mold[,]" they sought an updated mold assessment from TMI.

After TMI tested the McBeths' house in June 2019, it reported that the house contained dangerous levels of different molds and was "uninhabitable." The McBeths followed TMI's recommendation to avoid the house and to dispose of everything that had been in the house, including their clothes and other property. Pursuant to TMI's advice, the McBeths not only obtained a rental car and moved into a hotel, they bought new clothes for all family members and new car seats for the children. They also stayed with friends and neighbors for a time during this period, but eventually found a suitable new house after being displaced for about six months. Once they moved out of the house, their symptoms improved. They planned

to buy a different house but did not want to buy a new one "because of off-gassing that happens from materials that are naturally part of the home-building process."

After receiving TMI's mold assessment, Beau connected S&R's cleaning in June 2017 and the subsequent mold discovery. He "immediately recalled what [he] had seen, and the conversations with Servpro at the point of the assessment and the concerns for the water and what looked to be mold[.]" He therefore contacted S&R to obtain additional information and was told that in Texas, a company can be licensed to either assess mold or remediate it, but not both. S&R also told Beau that S&R's license to remediate mold precluded it from testing for mold. Beau then responded to S&R as follows:

> I appreciate the explanation, which aligns with our understanding. We hired Servpro based on your expertise with water and mold being the cornerstone of your business, including defined assessment, remediation and restoration processes explained in your sales materials. With respect for our job, please email me outstanding documentation of Servpro's Step 2 Inspection of Damage Assessment as defined in your Water Damage Restoration Process, along with the website address, prior to making the recommendations performed in our service. Thanks in advance for your response.

S&R then provided Beau its process documents as well as its job report showing the photographs of the house both before and after S&R cleaned the subfloors. Beau shared this information with TMI. Beau testified to his repeated attempts to work with S&R, but it declined his requests for a meeting. He then contacted several attorneys and he and Erica ultimately retained his trial counsel.

15

Beau testified that although Servpro/S&R's website reflects that they perform an inspection and damage assessment, he did not believe that they did so at his house because he would have expected them to be able to see what was pictured in the Servpro job report and recognize that something more needed to be done.

The McBeths investigated the cost of remediating the mold damage and discovered that the projected cost exceeded the home's value. In July 2021, they sold the house to a contractor who performed his own remediation before selling it for a profit.

Beau acknowledged having previously sued Aggie and EMSL, alleging that they misrepresented the mold levels in the house, but they were nonsuited before trial.

### D. Erica McBeth's Testimony

Erica McBeth is Beau McBeth's wife and is a stay-at-home mother who teaches the couple's three home-schooled children. Erica described the symptoms that led her to suspect mold exposure, specifically recalling that she experienced "[r]eally debilitating migraine headaches[,]" intermittent arm numbness, skin lesions, and gastrointestinal difficulties. She testified she did not have these symptoms before occupying the house, and her symptoms improved after moving out of the house.

Erica described the methodology for estimating the value of the property left in the house: they tried to remember what was in each room and referred to photographs and receipts to refresh their memories. When she had no receipts, she searched the internet for similar items to obtain estimated values. Erica testified that the total exceeded the $126,420.72 figure reflected in Plaintiffs' Exhibit 62 through 64. These exhibits also reflect estimates, invoices, and work orders for the materials and home renovations as well as photographs of the house and the family.

Although Erica did not deal with anyone from Servpro or S&R, she had several conversations with Rachal and was involved with the decision to retain their trial counsel; they chose him because they could not afford the other attorneys they consulted.

**E. Susan Meacham's Testimony**

Susan Meacham ("Meacham") is the owner and president of S&R, d/b/a SERVPRO The Woodlands/Conroe, a franchise she bought in 2009. She owns seven additional franchises in Texas, and two in South Carolina. Meacham has owned other Servpro franchises since buying her first one in 2002. Her husband, Randy Meacham, handles many of the sales aspects of these businesses; he also holds a mold remediation contractor's license. S&R did not employ a mold assessor. She was unable to recall whether S&R employed other licensed mold remediation contractors in 2017 when S&R cleaned the McBeths' house. Meacham described the

17

various levels of training that her employees might have and indicated that training achievements would differ with their industry tenure or job categories. For example, Jeremy Pierre, who worked on the McBeths' house, was trained as a crew chief, above a technician, and accordingly would have been trained at a crew chief level. Meacham could not, however, testify to the particulars of his training. Also, Servpro offers training that its franchisees can offer their employees. She explained that she has three different departments: production, office, and sales. The production department includes the technicians in the field and the managers overseeing them. S&R offers different services, including general cleaning, damage restoration, fire damage restoration, contents restoration, flood recovery services, and document restoration. Meacham testified that most of S&R's work consists of addressing water and fire damage; when pressed for a guess, Meacham stated that S&R performed "maybe" fifty mold remediations in 2017.

In response to questions about S&R's relationship with Servpro, Meacham stated that S&R is an independently owned franchise and that Servpro does not dictate the details of either S&R's business practices or its remediation methods. Meacham further testified that much of S&R's advertising is created by the franchisor and although S&R can add some website content, like employees' photographs, it has no control over most information included on the site. S&R does not either assess mold or determine whether such assessment is necessary. When a

18

caller has mold concerns, an industrial hygienist assesses any mold and writes a mold remediation protocol for the mold remediation company to follow. Meacham disagreed that Servpro/S&R's advertising could lead someone to believe that S&R assessed mold. Meacham testified that S&R has performed mold remediation for years.

Meacham explained how a call to the national call center is routed to S&R. The call center takes general information about the caller's name, the address of the loss, the type of damage, the caller's concerns, and any insurance coverage. The call center locates the correct Servpro franchise based on the zip code of the property and downloads the client's information into a software database. S&R then takes that information, contacts the client to confirm the details, prints a work order, and dispatches the crew. She noted that they ask about insurance coverage because when that applies to a loss, S&R uses certain software "with industry-standard pricing." In the McBeth's case, the call center entered the initial information on the form such as Beau McBeth's name, address, and the type of damage. The call center also entered the "type of loss" from a drop-down menu. This menu includes "mold" as an option, but the call center entered "general cleaning." As with the client's contact information, and loss type, the call center entered the "Loss Notes," from information Beau McBeth provided at the time he called. These Loss Notes read:

19

Purchased home this past Monday. The contractor doing renovation found subfloor beneath carpet and padding has mud when carpet was originally laid. He said it looks like the original contractors walked on the subfloor with muddy feet from the rains before the grass had grown. Customer has not seen home since contractor has been removing the carpet and padding, but said it looks like the previous owner also had a dog that left urine stains in the home. 3100-square-foot home. Entire second floor and bedroom and study downstairs need to be cleaned. He is also interested in having post construction cleanup once contractors are finished. Quoted $162.30 plus $2 per square foot. Customer would like this done ASAP. I told his scheduling would contact him today regarding a day and time. Home built in 2001.

The $162.30 was the charge for a service call, and the remaining charges were for cleaning; the notes contain no reference to mold, water damage, or laboratory testing. If a mold remediation were contemplated, S&R's paperwork would reflect the use of more items than S&R used at the McBeth house, such as an air scrubber, a HEPA filter, a HEPA vacuum, and personal protective equipment. S&R personnel likely added the handwritten notes showing the date, appointment time, and the supplemental charge for the Sporicidin. Like other documentation contemporaneous to Beau McBeth's 2017 contact with either Servpro or S&R, this document not does not mention mold, water damage, or an assessment.

Meacham testified that according to S&R's records, on June 28, 2017, Beau called Servpro's corporate office in Tennessee, where personnel gathered information about the McBeths' situation and forwarded it to S&R. S&R then contacted Beau about the job and provided him a cost estimate. At that time, Beau

20

did not indicate he had a possible mold problem, but instead, advised that mud "had been tracked in from outside before grass was laid[.]" Meacham testified that if Beau had voiced concerns about mold in the house, S&R would have referred him to an industrial hygienist to test the mold and write a mold remediation protocol as referenced above. She also compared the before-and-after photographs that S&R personnel took at the McBeth house, noting that the "before" photographs do not show the mud-like substance generating from or growing up the walls; the "after" photographs show that the mud-like substance had been cleaned.

The post-cleaning notes in S&R's records state that Beau showed the two S&R technicians

> the areas of the home he wanted cleaned, as we talked, I took photos. Homeowner states during the removal of carpet and pad, contractors tracked mud on the stairwell subfloor (plywood) and throughout the upstairs portion of the home. We cleaned the sub-flooring in a total of 8 rooms including the staircase. We used 2 mops, 1 broom, 1 scrapper [sic], 2 pump sprayers, and 4 gallons of sporicidin to clean up the mud. Homeowner had me text photos of the process to him, he was so stunned he had to make a trip to the house and see for himself. He is pleased with the work and is considering using our services for post construction cleaning. Homeowner handed me a check for services, it is photoed and placed inside of the work order. No equipment is left onsite, all forms are signed and saved into Drybook [a computer program]. Left home at 2:25 pm.

Similarly, this paperwork contains no mention of mold, water damage, an assessment, or remediation, nor did any of the multiple documented contacts between Beau and Servpro/S&R.

21

Meacham described S&R's file retention procedure, stating that files are stored by year. Since Beau did not contact S&R for two years after S&R cleaned his subfloors, S&R had to physically retrieve his file from storage. In response to Plaintiff's counsel's questions, Meacham read from e-mails and file material pertaining to this matter, including a July 7, 2019 note about Beau's inquiry about "the final estimate and drying logs[]" for S&R's work at the McBeth house.

**F. Matt Powell's Testimony**

Powell, the McBeths' realtor, testified that the McBeths sold the subject house for $425,000.00, less than market value, because of the mold problem at the property. He also testified to reasonable rental rates for the house in 2017 and at the time of trial. According to Powell, from 2017 to 2019, the house would have rented for $3500.00 per month and for $3800.00 to $4000.00 per month when the case was tried in 2022. In addition, Powell testified that after remediation, the house sold for $600,000.00.

**G. Documentary Evidence**

The documentary evidence includes printouts from both Servpro's and S&R's websites. Some of these documents show the national toll-free telephone number and reflect that Servpro offers services such as cleaning and restoration of fire and water damage as well as mold remediation and restoration. Servpro's and S&R's

websites also advertise "[c]arpet & [u]pholstery cleaning," in addition to "[d]rapes,

[b]linds, [w]indow [treatments]," and assistance with insurance claims.

These materials also state:

Any home or business can quickly become infested with mold with the introduction of a water source, like a roof or plumbing leak. Mold can spread throughout a property in as little as 48-72 hours, and can produce allergens and irritants that have the potential to cause other health effects.

Servpro further advertises that it offers "[h]ighly [t]rained [w]ater

[r]estoration [s]pecialists" and "[m]old [r]estoration [p]rocess." It also states,

however,

Microscopic mold spores exist almost everywhere, outdoors and indoors, making it impossible to remove all mold from a home or business. Some restoration businesses advertise "mold removal" and even guarantee to remove all mold, which is a fallacy. Consider the following mold facts:

- Mold is present almost everywhere, indoors and outdoors.
- Mold spores are microscopic and float along in the air, and may enter your home through windows, doors, or AC/heating systems or even hitch a ride indoors on your clothing or on a pet.
- Mold spores thrive on moisture. Mold spores can quickly grow into colonies when exposed to water.
- Before mold remediation can begin, any sources of water or moisture must be addressed. Otherwise, the mold may return.
- Mold often produces a strong, musty odor and can lead you to possible mold problem areas.
- Even higher-than-normal indoor humidity can support mold growth. Keep indoor humidity below 45 percent.

23

Elsewhere on its site, Servpro states, "[i]f you suspect that your home or business has a mold problem, SERVPRO Franchise Professionals can inspect and assess your property. If mold is found, they have the training, equipment, and expertise to handle the situation." In addition, the sites use the word "franchise" and state "LOCATE A LOCAL FRANCHISE" in multiple locations. Servpro's and S&R's sites also show photographs of mold and the mold remediation process, but these photographs do not depict the McBeths' property.

Although S&R's site states that it can "carefully inspect your property for signs of mold[,]" a precaution, in red font, immediately precedes this statement and advises that "[l]ocal and state laws may require a specific inspection and documentation protocol based on the size of the affected area. We can advise you on this process, providing guidance based on your unique situation."

The McBeths' Exhibits 27 through 29 contain the paperwork pertinent to the McBeths' house and before and after photographs of the flooring. These documents show not only the information about S&R's 2017 job type and location, they show the condition of the uncarpeted subfloors before S&R cleaned them and afterward. The "before" pictures show a dark substance on the subfloors; this substance is not shown in the "after" pictures.

The McBeths' other exhibits cover multiple topics, including discovery matters, mold assessments, remediation protocols, laboratory reports, and cost

estimates. These exhibits show that there were certain types of mold when Rachal's company, TMI, assessed the McBeths' property in 2019, almost exactly two years after S&R cleaned the subfloors in 2017. Documentation reflecting the anticipated schedule and costs of renovating and landscaping the property are also shown. The McBeths also introduced the franchise agreement between Servpro and S&R and a market analysis for the house.

In addition to exhibits previously described, Defendants introduced Beau's signed consent form to perform services and his signed consent form to use Sporicidin in the house. Both these forms are dated June 29, 2017. Above Beau's signature, the Authorization to Perform Services states, in bold font, "**I HAVE READ THIS AUTHORIZATION TO PERFORM SERVICES AND DIRECTION OF PAYMENT, INCLUDING THE TERMS AND CONDITIONS OF SERVICE ON THE NEXT PAGE HEREOF, AND AGREE TO SAME**." Those terms and conditions of service contain a limitation of liability and limitation of remedies. These limitations state that "the Provider" [S&R] is an independent contractor and "the Franchisor [Servpro] is not a party to any agreement with Client [the McBeths], is not a guarantor of the Provider's Services, and is not subject to liability arising out of such services." They also include the acknowledgement that "mold is commonly found throughout the environment and

25

that it is impossible to eradicate mold. PROVIDER DOES NOT GUARANTEE THE REMOVAL OR ERADICATION OF MOLD."

In this same document, in bold font, S&R disclaimed "**ALL OTHER WARRANTIES AND ALL IMPLIED WARRANTIES**" as well as liability for "**INDIRECT, SPECIAL, NOMINAL, INCIDENDTAL, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES, OR FOR ANY PENALTIES, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY ASSERTED, INCLUDING CONTRACT, NEGLIGENCE, WARRANTY, STRICT LIABILITY, STATUTE OR OTHERWISE[.]**" It further limits any recoverable damages to the lesser of "**THREE TIMES THE AMOUNT PAID BY CUSTOMER FOR THE SERVICES OR ACTUAL PROVEN DAMAGES,**" requires any claim for "faulty performance, for nonperformance or other breach" to be made within sixty days after completion of services[,]" or within one year "AFTER THE CLAIMING PARTY KNEW OR SHOULD HAVE KNOWN OF THE CAUSE OF ACTION." Both parties to the contract, the McBeths and S&R, waived their right to a jury trial, agreeing that "ANY AND ALL CLAIMS OR CAUSES OF ACTION (INCLUDING COUNTERCLAIMS) RELATED TO OR ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS CONTRACT AND AGREE THAT ANY CLAIM OR CAUSE OF ACTION WILL BE TRIED BY A COURT TRIAL WITHOUT A JURY. A severability clause provided that if

any portion of the contract were determined to be unenforceable, the remainder of the contract would "remain in full force and effect."

S&R's website contains similar language. In the Website Terms of Use, is states, "[b]y using this website, you are agreeing to our Terms of Website Use and our internet policies which may change from time to time[.]" It continues, disclaiming all warranties, and stating:

> Under no circumstances will SERVPRO, its affiliates, or their employees or agents (all collectively "Servpro Industries, Inc.") be liable for any improper or incorrect use of, reliance upon, or reference to any of the information contained on this website, . . . or for any damages suffered from the direct or indirect use of, reliance upon, or reference to any of the information or content on this website, . . . Under no circumstances shall SERVPRO be liable under any theory of recovery, at law or at equity, for any types of damages, including, without limitation: direct, indirect, special, incidental, consequential, or punitive damages, or for loss of use, or lost profits, which arise out of or relate in any manner to the use, performance of, reliance upon, or access to any information, services, software, documents, or content originating from or with respect to this website, or any linked Internet address. Any claims that arise out of, relate to or are connected with the website, materials and content contained on this website or any link to an Internet address, shall be governed by, and construed in accordance with, the laws of the State of Tennessee. Any action commenced with respect to this website which concerns this website in any way shall be venued in either a Federal District Court located in Nashville, Tennessee, or a court located in Sumner County, Tennessee, and all such persons making such claims consent to the jurisdiction of such courts for these purposes.

Defendants' exhibits include the October 19, 2018 mold assessment by Aggie Inspector Group, showing that although the McBeths' house contained some mold,

27

the mold was not dangerous. The August 8, 2019 Moisture Assessment Report was also in evidence. This report noted inadequate caulking at multiple locations in addition to inadequate window pane flashing. The report further states that the exterior light fixtures and the transitions between the stone and the siding are not waterproofed, noting that "[m]oisture intrusion can occur if proper repairs are not made. Factors, such as wind and rain, can cause new problems on homes."

Defendants' Exhibit 12 is a June 29, 2019 plumbing invoice reflecting a "suspected leak at toilet flange, has water stain in garage ceiling, suspected leak in attic at copper pipe to upstairs guest bath." The description of the work performed shows that the plumber ruled out the suspected leaks involving the copper pipe and the toilet flange but believed that there was a slow toilet leak beyond the wax seal and that this leak caused the garage ceiling damage. The plumber reset the toilet and observed no further leaks.

## II. Standard of Review

We review a trial court's grant of a JNOV under a no-evidence standard. *See Bank of Am., N.A. v. Eisenhauer*, 474 S.W.3d 264, 265 (Tex. 2015). There is no evidence to support a verdict when there is: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes

28

the opposite of a vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citation omitted); *see also Flores v. Ochoa*, No. 09-21-00384-CV, 2024 WL 3706855, at *8 (Tex. App.—Beaumont Aug. 8, 2024, no pet.) (mem. op.) (citation omitted).

The McBeths contend that the trial court erred by granting Servpro's and S&R's Motion for Judgment Notwithstanding the Verdict. Generally, a trial court must render a judgment based on a jury's verdict in a case; a trial court is authorized to grant a motion to disregard a jury's verdict only if a directed verdict on the issues would have been proper. *See* Tex. R. Civ. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991). When a trial court's decision to disregard a jury's verdict is challenged on appeal, we review the challenge using the same standard that we use to review a challenge to a trial court's decision to grant a directed verdict. *See Senegal v. Payne*, No. 09-13-00508-CV, 2015 WL 4053504, at *2 (Tex. App.—Beaumont July 2, 2015, no pet.) (mem. op.); *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Under that standard, to justify the trial court's decision to disregard the jury's verdict in this case, the record must conclusively establish that the jury could reach only one decision on the liability issues submitted to it, and that no reasonable factfinder would conclude on this record that the McBeths were entitled to the recovery they sought. *See Prudential Ins. Co. of Am. v. Fin. Review Servs. Inc.*, 29 S.W.3d 74, 77

29

(Tex. 2000); *In re Estate of Longron*, 211 S.W.3d 434, 438 (Tex. App.—Beaumont 2006, pet. denied). When the trial court does not state the reason it granted the JNOV, and the motion for JNOV presents multiple grounds on which it should be granted, the appellant has the burden to show that the JNOV cannot be sustained on any grounds stated in the motion. *See Sbrusch*, 818 S.W.2d at 394; *see also Arlington Home, Inc., v. Peak Env't. Consultants, Inc.*, 361 S.W.3d 773, 777-78 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (affirming JNOV because nonmovant failed to refute movant's alleged superseding cause of mold).

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. In evaluating the evidence's legal sufficiency, we review the entire record and "credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller*, 168 S.W.3d at 827); *see Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 114 (Tex. App.—Beaumont 2005, pet. denied) (citation omitted). Under a legal sufficiency review, "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

30

### III. Applicable Law

A toxic tort is a cause of action arising out of exposure to a hazardous substance, including toxic mold. *See Starr v. A.J. Struss & Co.*, No. 01-14-00702-CV, 2015 WL 4139028, at *7 (Tex. App.—Houston [1st Dist.] July 9, 2015, no pet.) (mem. op.). "A cause of action relating to mold exposure constitutes a toxic tort." *Zhaohong Wu v. Lumber Liquidators, Inc.*, No. 14-20-00765-CV, 2024 WL 3160554, at *8 (Tex. App.—Houston [14th Dist.] June 25, 2024, no pet.) (mem. op.) (citations omitted).

We recognize that many cases dealing with liability for mold exposure address personal injury claims rather than property damage claims. *See, e.g.*, *Gaudette v. Conn Appliances, Inc.*, No. 09-06-00444-CV, 2007 WL 2493437, at *1 (Tex. App.—Beaumont Sep. 6, 2007, no pet.) (mem. op). When it comes to proof of causation, however, there is no difference in what a plaintiff requires to prevail: scientifically reliable expert evidence linking the alleged cause to the alleged effect. *See Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 76 (Tex. 2023) (expressly applying the same standard to property damage and personal injury cases); *see also Plunkett v. Conn. Gen. Life Ins. Co.*, 285 S.W.3d 106, 115–16 (Tex. App.—Dallas 2009, pet. denied) (affirming summary judgment in a suit including a claim for property damage allegedly due to mold). Accordingly, evidentiary standards of causation apply equally to mold-related property damage and personal injury claims. *See*

31

*Helena Chem. Co.*, 664 S.W.3d at 76. Such cases usually require proof of both general and specific causation linking the stimulus to its alleged result. *See Mobil Oil Corp. v. Bailey*, 187 S.W.3d 265, 270 (Tex. App.—Beaumont 2006, pet. denied) (referencing the alleged causal relationships among asbestos, cigarette smoking, and lung cancer). A party proves general causation through evidence showing that the stimulus is capable of causing the alleged result. *See Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex. 1997); *see also Mobil Oil*, 187 S.W.3d at 270 (same). Proof of specific causation, however, requires evidence that the substance caused a particular injury or damage. *See Havner*, 953 S.W.2d at 714–15. Specific causation may be established by evidence showing that exposure to the substance increased the risk of their particular harm. *See id.*

Since the effects of mold are matters outside the knowledge of laypersons, causation must be proven using reliable expert evidence. *See Starr*, 2015 WL 4139028, at **7–8 (affirming summary judgment in a mold case in the absence of expert evidence); *see also Gaudette*, 2007 WL 2493437, at *8 (affirming summary judgment based on the exclusion of unreliable expert evidence). The expert's opinion must be reliable, and the "mere *ipse dixit* of a credentialed witness[]" will not support a verdict. *Univ. of Tex. Sys. v. Bartek*, No. 05-20-00525-CV, 2022 WL 17986015, at **5–6, 9 (Tex. App.—Dallas Dec. 29, 2022, no pet.) (mem. op.) (reversing a judgment in the plaintiff's favor in a mold case because her expert was

32

unreliable). The proponent of the evidence bears the burden of establishing reliability. *See Plunkett,* 285 S.W.3d at 115–16 (addressing expert testimony in the context of summary judgment in a mold case). When an expert's opinion "suffers from analytical gaps," it is unreliable. *Bartek*, 2022 WL 17986015, at *9. When evaluating the reliability of an expert's opinion, we also look to the six non-exclusive factors set forth in *E.I. DuPont de Nemours & Co. v. Robinson*. 923 S.W.2d 549, 557 (Tex. 1995); *see Helena Chem. Co.*, 664 S.W.3d at 74. Also, the plaintiff must negate other plausible causes of the harm, provided that such causes are raised by the evidence. *See Helena Chem. Co.*, 664 S.W.3d at 80–81 (citing *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010)).

## IV. Analysis

The McBeths' first issue, with multiple subparts, argues that "[t]he trial court erred by granting Defendants' Motion for Judgement [sic] Notwithstanding the Verdict because the verdict of the jury was supported by competent uncontroverted evidence." One such subpart states that in 2017 and 2019, the house contained "mold requiring remediation[,]" and Servpro's and S&R's acts therefore were a producing cause of the McBeths' damages because the McBeths relied on those acts.

In the McBeths' Third Amended Petition, their live pleading at the time of trial, they alleged causes of action against Servpro and S&R for negligence and

33

violations of the DTPA.[6] Causation is an essential element of both a negligence and a DTPA cause of action. *See Doe v. Boys Clubs*, 907 S.W.2d 472, 477–82 (Tex. 1995) (addressing the causation element in both negligence and DTPA contexts); *see also* Tex. Bus. & Com. Code Ann. § 17.50(a) (setting forth the producing cause standard of economic damages or mental anguish in the context of a DTPA claim).

The essence of the McBeths' claims is that S&R, and by extension Servpro, did not "identify or address the source of the mold, and also failed to create a mold remediation protocol[.]" The McBeths contend that S&R's failure to test and identify the unknown substance as mold in 2017 allowed the proliferation of mold, which caused the McBeths' medical symptoms, which eventually led to the testing for and discovery of mold in the house in 2019, two years after S&R provided its services. They contend that S&R's failure deprived them of the opportunity to have the "mold" remediated in 2017, thus allowing mold to spread and cause costly property damage. They further contend that Servpro was vicariously liable for S&R's acts.

According to the McBeths' theories of recovery, the "mold" discovered in 2017 cost them not only the diminished value of their house, but the value of the mold-contaminated personal property that they had to leave behind when they

---

[6] The McBeths' Third Amended Petition also alleged causes of action for fraud and breach of contract. Since the McBeths abandoned their breach of contract claim and since the jury answered the fraud questions in Servpro's and S&R's favor, we need not consider the contract or fraud aspects of the McBeths' claim.

moved out of the house to avoid the mold. The McBeths contend that if S&R had correctly identified the unknown substance as mold requiring remediation in 2017, they would have had it remediated and the "mold" would not have spread to other areas of their house necessitating extensive remediation, a sale at a loss, and the loss of the possessions in the house.

Since the causation element of a mold damage claim must be proven through expert evidence, and since Rachal was the only expert to offer such causation evidence, we must examine his opinion to see whether it adequately supports the jury's findings that Servpro's/S&R's acts were a proximate or producing cause of the McBeths' damages. *See Gaudette*, 2007 WL 2493437, at *8. If Rachal's opinion, that Servpro/S&R should have tested the mud-like substance, exhibits analytical gaps, it will not support the jury's verdict. *See Bartek*, 2022 WL 17986015, at **5–6. Under *Robinson*, we may look to the following non-exclusive factors to determine whether Rachal's opinion is scientifically reliable:

1. the extent to which the theory has been or can be tested;
2. the extent to which the technique relies upon the subjective interpretation of the expert;
3. whether the theory has been subjected to peer review or publication;
4. the technique's potential rate of error;
5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
6. the non-judicial uses which have been made of the theory or technique.

*See Robinson*, 923 S.W.2d at 557.

35

Rachal testified that he does not necessarily assess mold with an eye to future litigation, thus arguably describing a non-judicial use of his expertise. Rachal did not, however, testify that his opinion about testing the mud-like substance had been peer reviewed or was generally accepted in the relevant scientific community, or what the rate of error might be if all suspected mold were tested. His theory cannot be tested because the mud-like substance was not sampled or tested in 2017, and it therefore cannot be determined whether the same or a similar substance was or was not present two years later. Further, although Rachal opined that he would have tested it, he did not offer evidence of industry standards or that such standards would have required S&R to sample the substance they cleaned in 2017. Absent this testimony, there is no evidence that a breach of any duty proximately caused the McBeths' alleged damages. *See Gaudette*, 2007 WL 2493437, at *7 ("we are required to look to what is generally accepted in the scientific community") (citing *Havner*, 953 S.W. at 720-21). By evaluating Rachal's opinion against the *Robinson* factors, we conclude that his opinion was not shown to be sufficiently reliable to support the conclusion that the McBeths' house contained mold in 2017.

Assuming without deciding that Servpro/S&R improperly advertised mold assessment or remediation, thus violating the DTPA or other relevant standards, if the unknown substance found in 2017 was not mold, it did not require remediation and could not have led to the mold "contamination" Rachal diagnosed two years

36

later in 2019. Even if this mud-like substance was mold, if it was not toxic mold, the same logic applies: it could not have caused the McBeths' damages. Therefore, the threshold inquiry is whether the evidence shows that the McBeths' home contained toxic mold, or any mold, on June 29, 2017, the date that S&R allegedly should have recognized the "mold" and proceeded accordingly.

The McBeths' theory of recovery assumes, without reliable supporting expert evidence, that the unknown substance found on the subfloors in 2017 was, indeed, mold. Their theory further assumes, again without reliable supporting expert evidence, that this "mold" was toxic. Accordingly, the McBeths posit that S&R's failure to discover this "toxic mold" in 2017 was a producing cause of their damages. This approach to causation, however, overlooks the need for expert evidence to connect the mud-like substance found in 2017 with the mold found in 2019 that allegedly contaminated the house to the point that it became uninhabitable. *See Helena Chem. Co*. 664 S.W.3d at 71–80, 82 (affirming summary judgment absent reliable expert scientific evidence linking aerial spraying drift to reduced crop yield); *Starr*, 2015 WL 4139028, at *7 (requiring expert testimony to show causation in a mold case). Absent evidence of the standard of care in such a case, or that S&R had a duty to test the unknown substance in 2017, we cannot say that a S&R's acts or omissions caused or contributed to the McBeths' damages. *See Helena Chem. Co.*, 664 S.W.3d at 75, n. 5 (requiring the standard of care for aerial spraying to be shown

37

by expert testimony); *see also Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580, 582–85 (Tex. 2023) (discussing duty in the context of a negligence case).

In *Helena Chemical*, the plaintiffs alleged that aerial spraying of an herbicide up to twenty-five miles from their cotton fields damaged their crops and caused a reduced crop yield. 664 S.W.3d at 69–70. The court determined that the plaintiffs had presented insufficient causation evidence because they did not offer evidence to "fill the gap in the testing data." *Id*. at 77–80. Likewise, the McBeths have not accounted for the analytical gap between a mud-like substance reported in 2017 and mold discovered in 2019.

The McBeths assume that there was mold in their house in 2017, as have their witnesses. The McBeths rely on this assumption to support their contention that S&R wrongfully failed to properly address this "mold," leading to the McBeths' damages. If, however, an opinion is based on an erroneous assumption, it is no evidence. *See Bartek*, 2022 WL 17986015, at *8. Since the mud-like substance found in 2017 was not sampled or tested, and since the McBeths adduced no evidence that S&R had a duty to test it, the opinions based on the unverified assumption that it was mold cannot support the jury's verdict. *See id.*

The McBeths also assume that the unknown substance found in 2017 was not only mold, but toxic mold. They base this assumption in part on the alleged temporal

38

relationship between the appearance and severity of their symptoms and the duration of their residence in the house. The McBeths' argument that they were not ill before moving into the house and improved after moving out is not evidence of S&R's alleged error, but instead relies on the fallacy of *post hoc ergo propter hoc*. *See Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) ("[c]are must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first."); *Leafguard of Tex. v. Guidry*, No. 09-21-00034-CV, 2023 WL 3369176, at *7 (Tex. App.—Beaumont May 11, 2023, no pet.) (mem. op.). Chronology will not support a finding of causation. *See Leafguard,* 2023 WL 3369176, at *7. Although the *Jelinek* court recognized that a close temporal proximity raises the suspicion that the event caused the conditions, "suspicion has not been and is not legally sufficient to support a finding of legal causation." *Jelinek*, 328 S.W.3d at 533 (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007)).

While we do not dispute that Rachal found mold in the McBeths' house in 2019, this mold discovery cannot support the belief that there was mold in the house two years earlier, or that Servpro/S&R should have tested and discovered it. *See Arlington Home*, 361 S.W.3d at 780–81 (affirming JNOV despite expert testimony that the mold identified "a few months" after an inspection "that mold was present in such density and over such a wide surface that it had to have been present when Live Oak performed its inspection in September 2005").

We further observe that although the McBeths' symptoms are what eventually led them to have their house tested for mold, they have not met their burden to negate plausible alternate causes of their symptoms raised by the evidence. *See Helena Chem. Co.*, 664 S.W.3d at 80. When the McBeths renovated the house in 2017, they not only replaced the flooring, they replaced the HVAC system, replaced lighting fixtures, and remodeled the kitchen. It is plausible that, as the Aggies determined when they assessed the mold levels, the mold levels in the house were not dangerous, and the McBeths' symptoms were instead a reaction to the materials used to renovate the house. Beau implicitly acknowledged this plausible alternate scenario when he testified that they sought a house that was not new construction "because of off-gassing that happens from materials that are naturally part of the home-building process." Since the McBeths failed to negate a relationship between their symptoms and off-gassing from the materials used to renovate the house, they have not shown that their symptoms were due to mold exposure.

Since the McBeths did not prove that any act or omission by Servpro or S&R caused their damages, we overrule their first appellate issue. We need not consider their second appellate issue, the alleged applicability of the economic loss rule, because doing so would not alter the outcome of their appeal. *See* Tex. R. App. P. 47.1.

## V. Conclusion

Having overruled the McBeths' first issue on appeal and declining to consider their second issue, we affirm the trial court's Judgment Notwithstanding the Verdict.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on November 21, 2023
Opinion Delivered December 19, 2024

Before Golemon, C.J., Wright and Chambers, JJ.